[Nos. H007202, H007683. Sixth Dist. Jan. 15, 1992.]

SAM EWING, Plaintiff and Respondent, v.
GILL INDUSTRIES, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rule 976(b), this opinion is certified for publication with the exception of parts I, IV and V of the Discussion.

602

COUNSEL

Olimpia, Whelan & Lively, Gary L. Olimpia and James J. Der, Jr., for Defendant and Appellant.

Ellen Lake, McGuinn, Hillsman & Palefsky, John McGuinn, Altshuler, Berzon, Nussbaum, Berzon & Rubin and Fred H. Altshuler for Plaintiff and Respondent.

OPINION

**AGLIANO, P. J.**—Plaintiff Sam Ewing brought this action against his employer Gill Industries, Inc. (Gill), alleging he was discharged on the basis

of age in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.). Gill appeals from the judgment entered on a jury verdict awarding Ewing $122,850 in damages. Gill also appeals from the order granting Ewing's motion for attorney's fees.[1] On appeal, Gill asserts error in exclusion of evidence, jury instructions, failure to grant nonsuit, and amounts of the damage and attorney's fee awards. For the reasons stated below, we modify the judgment as to the amount of damages. In all other respects, the judgment is affirmed.

## Statement of Facts

The evidence in support of the verdict is largely circumstantial. Ewing was born in 1920. He worked for several years in radio broadcasting. In 1969 Gill hired him as a writer, producer and promotion person for television station KNTV, channel 11. On April 3, 1979, Gill made Ewing the director of media services for Gill Cable. Ewing supervised an eight- to ten-person staff. His responsibilities included the following: selection, ordering, scheduling and promotion of films for the G Channel; screening and selection of adult films for the Rendezvous Channel; development and publication of the Gill Cable Guide, a monthly program guide; selection, ordering, scheduling and promotion of films for the pay-per-view movie channel; selection and promotion of the Classic Movie Channel, which showed older movies, until that channel was eliminated in 1982 or 1983; publication of the "Gilline" Newsletter; some promotional advertising duties; and special promotional projects, including telethons, sporting events, concerts, ad campaigns, and direct mail advertising.

In August 1983, when Ewing was 63, Gill contracted with Home Theater Network, Inc. (HTN) and transferred to HTN Ewing's duties involving the G Channel. HTN chose the movies and broadcast them by satellite. The movies provided by HTN were of lower quality than those chosen by Ewing and customers complained about the change. Although the cost savings for Gill was $230,564, Gill did not ask Ewing if he could produce the G Channel on a lower budget. Ewing testified that he spent less than that allotted in his budget and could have produced the G Channel for far less than the amount that HTN charged Gill.

On October 1, 1983, Gill replaced the Rendezvous Channel with the Playboy Channel, eliminating Ewing's film selection function with the Rendezvous Channel.

On July 1, 1983, Gill hired 33-year-old David Katz and transferred to Katz Ewing's duties involving print display advertising, direct mail advertising,

---

[1]Pursuant to stipulation of counsel, the appeals in actions Nos. H007202 and H007683 are consolidated for purposes of this decision.

bill stuffers, and promotion for special pay-per-view events, such as sporting events and concerts.

In May 1984, Gill transferred the production of Gill Cable Guide to TVSM. The cost savings amounted to $619,530. Only a small portion of the new guide was devoted to Gill-specific programming, because the advent of national channels, such as HBO, ESPN and others, did not require local preparation. As a result of this decision, the staff in Ewing's department was reduced to Ewing and a secretary. Nevertheless, Ewing was still required to select a cover and photographs, prepare synopses of movies, obtain advertising copy from Katz and others, obtain the list of pay-per-view movies, obtain the G Channel information from HTN, write a column, and mail these materials to TVSM.

In May 1984, Bay Area Interconnect (BAI), a joint venture of Gill and Viacom Cablevision, hired 29-year-old Brad Harlan. Harlan was hired to promote the Classic Movie Channel, one of Ewing's former duties. BAI was located in a building adjoining Gill's offices, its broadcast studios transmitted all of Gill's programing to Gill's customers, and its personnel had constituted Gill's broadcast department. Harlan was a BAI employee. However, in its response to the Department of Fair Employment and Housing in connection with Ewing's age discrimination claim, Gill listed all BAI employees, including Harlan, as employees of Gill. The form also indicated that Gill Cable and BAI were part of Gill.

Robert Hosfeldt, president of Gill and a member of the BAI board of directors, knew BAI was interested in hiring someone to promote the Classic Movie Channel, knew Ewing promoted the Classic Movie Channel in 1982 and knew some of Ewing's functions had been eliminated, yet he did not suggest that Ewing be considered for this position.

In April 1985, Gill transferred Ewing's responsibilities for the pay-per-view movie channel to Harlan. During the 50 percent of his time that Harlan was performing pay-per-view duties, he was considered to be working for Gill. The pay-per-view movies were considered a Gill product and were seen only by Gill customers. Fifty percent, and later 100 percent, of Harlan's salary and 100 percent of Harlan's assistant's salary were paid by Gill. Gill also paid Harlan a commission based on the number of subscribers. Ewing never received a commission.

Ewing learned of the elimination of these duties when Hosfeldt told him to give the pay-per-view files to Harlan and to fire his secretary, the only other employee in the Media Services Department. Hosfeldt told Ewing that

Jack Yearwood, the general manager of BAI, thought that BAI would boost its advertising sales to other cable systems if it handled the pay-per-view movies. Since this explanation did not seem reasonable, Ewing asked Yearwood why he wanted the pay-per-view movies at BAI. Yearwood responded, "I didn't want them. Bob Hosfeldt came to me some time back and he said that you were retiring at the end of the year and said he wanted us to handle the pay-per-view."[2]

Since Ewing did not intend to retire, he then asked Ben Reichmuth, Gill's vice-president of marketing, "does Gill Cable intend to retire me at the end of the year?" Reichmuth appeared startled and said, "You will have to ask Bob Hosfeldt." Ewing next approached Carl English, Gill's vice-president of finance, who said, "Gee, as I understood it Brad Harlan was supposed to report to you." Ewing then confronted Hosfeldt with the conflicting versions and was told by him, "Oh, Jack Yearwood is mistaken. . . . he really wants the pay-per-view, and you are not going to be retired." "You can work here for as long as you want to." "The day that you retire is the day that I am going to open a Marie Callendar's restaurant in Santa Cruz." At trial, Hosfeldt testified that he transferred the pay-per-view duties in order to centralize all duties associated with pay-per-view at one location.

At the time Hosfeldt assured Ewing that his position was secure at Gill, he and Reichmuth had already decided to terminate him. Hosfeldt described the decision to fire Ewing as part of "organizational changes." However, out of 80 employees in the marketing division, only Ewing was to be fired and no other changes were made.

Allen Gilliland, the majority stockholder of Gill, told Hosfeldt that none of the "oldtimers" should be fired until after a pension and bonus program was in effect. Hosfeldt testified that it would have been "cruel" to warn Ewing of his firing.

In October 1985, Ewing asked English whether he would receive a cost-of-living raise like other Gill employees. English responded, "Well, aren't you retiring? You are going to be 65 in December. I mean, are you expecting a cost-of-living raise, or why should you get one?"

Various Gill employees made age-related remarks to Ewing at management meetings. English made comments to the effect that "this insurance

---

[2]The trial court overruled Gill's hearsay objection to Ewing's testimony concerning Yearwood's statements about what Hosfeldt had told him. This evidence was admissible not for its truth, but rather to allow the jury to evaluate Hosfeldt's response when Ewing later confronted him about the reason for the transfer of duties. Upon request, Gill was thus entitled to a limiting instruction. (Evid. Code, § 355.) Having failed to make such a request, the evidence was admissible for all purposes. (*Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 887-888 [92 Cal.Rptr. 162, 479 P.2d 362].)

doesn't apply to you, or the 401K retirement. I mean, you are too old to benefit. You old folks are costing the company a lot of money . . . ." English also told Ewing that he was "over the hill." Marilyn Glover, director of marketing services, told Ewing, "you don't need any insurance policy. You have a much younger wife. You can stay home and let her work. That's the best insurance policy you could possibly have." Other managers would also tease him about retiring.

In December 1986, Gill returned to transmitting its G Channel movies. Gill did not offer Ewing his former duties related to the G Channel. Instead it entered into a contract with the former president of HTN who was located in Portland, Maine.

On April 24, 1987, Hosfeldt told Ewing, "Sam, as you may have noticed, we have been systematically phasing out your job here." He then fired him and told him he would receive three months' severance pay. Ewing was earning $52,624 per year at the time of his termination. Ewing went out to lunch with his wife and when he returned, he was barred from his office until he was accompanied by a security officer.

At the time of his termination, Ewing's remaining duties consisted of special projects, Gilline and providing information for the Cable Guide. Gilline was eliminated, but Ewing's remaining duties were given to Harlan, Katz, and John Cotter.[3]

Ewing did some free-lance writing for Gill and BAI following his termination. He earned between $1,500 and $1,600. However, after he filed an employment discrimination complaint with the Department of Fair Employment and Housing, he received no further work from either company.

Other facts will be included as they relate to the issues on appeal.

*Discussion*

I.  *Exclusion of Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . .

II.  *Jury Instructions*

Gill contends the trial court erred in refusing to instruct the jury that Ewing was required to prove that a full-time job existed at the time of his termination in order to establish a prima facie case of age discrimination.

---

[3]Gill had hired 36-year-old Cotter in February 1987.
*See footnote, *ante*, page 601.

The trial court held an instruction conference to consider positions on and to finalize the instructions. Gill's counsel challenged the court's wording of the burden of proof instruction, stating, "What I am concerned about is this case involves over a period of years functions being transferred outside of the company, and here the jury could find that if one duty was performed by somebody else that that is enough, even though that one duty is not sufficient to justify continuing this person in his position on a full time basis. [¶] I don't think that is what the court wants to allow. That's not the law." The court overruled the objection.

The trial court then instructed the jury in relevant part: "To establish defendant's liability for age discrimination damages, the plaintiff has the burden of proving that plaintiff's age was a determining factor in defendant's decision to terminate plaintiff's employment. . . . [¶] Accordingly, though there may be more than one factor in defendant's decision to terminate plaintiff's employment, plaintiff is entitled to recover if he establishes both: one, that one such factor was his age; and, two, that in fact his age made a difference in determining whether or not the plaintiff was retained or terminated. [¶] Now, to enable you to render a fair and just verdict in this kind of case you are asked to follow a three-step consideration of the evidence, as follows: [¶] First, you must consider and decide whether the plaintiff has established the factual basis for an inference of age discrimination by proving the following facts: [¶] One, that plaintiff was over forty years of age; two, that his work performance was satisfactory; three, that he was terminated; and, four, that his duties were transferred to a substantially younger employee or employees with equal or lesser qualifications. [¶] Now, if the plaintiff has failed to prove any one or more of these foundational facts, he is not entitled to recover."

The special findings form stated in relevant part: "1. The plaintiff has established the factual basis for an inference of age discrimination by proving the following facts. . . . [¶] d. That his duties were transferred to a substantially younger employee or employees with equal or lesser qualifications. . . . [Yes/No]"

Shortly after the jury retired to deliberate, it asked: "Part D: Does this mean all of his duties or some? [¶] Specifically which duties are we talking about?"

Before the court answered the jury's question, Gill's counsel submitted the following instruction: "You are to determine whether the plaintiff's position was . . . [effectively] . . . eliminated and whether, if so, the duties transferred were sufficient to [justify plaintiff's continuing as a full-time employee] [amount to a full-time position]."

After hearing further argument from counsel, the trial court answered the jury's question as follows: "Neither 'all' nor 'some' are appropriate interpretations of the word 'duties' in this context. Nor are any particular duties referred to. An appropriate modification would be a significant amount of his duties were transferred." The court also repeated the instructions regarding Ewing's burden of proof.

"It is . . . well settled that a party has the right to have the jury instructed on his or her theory of the case, but has no right to require the court use any particular phraseology; as long as the court correctly instructs on the issue, it is free to modify an instruction or give one of its own in lieu of the one offered." (*Byrum* v. *Brand* (1990) 219 Cal.App.3d 926, 939 [268 Cal.Rptr. 609].)

Courts have not adopted a single statement of the elements of a prima facie case of age discrimination. As the United States Supreme Court observed in *McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 802, footnote 13 [36 L.Ed.2d 668, 677-678], "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." (Accord *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 253, fn. 6 [67 L.Ed.2d 207, 214, 101 S.Ct. 1089].)[4] In *Teamsters* v. *United States* (1977) 431 U.S. 324, 358 [52 L.Ed.2d 396, 429, 97 S.Ct. 1843], the court focused on the basic concept underlying a prima facie case of age discrimination: "The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act." The issue of which party bears the burden of proof "is merely a question of policy and fairness based on experience in the different situations." (9 Wigmore, Evidence (Chadbourn Rev. 1981) § 2486, p. 291.)

In following the *McDonnell Douglas* line of cases, courts have been flexible in setting forth the elements of a prima facie case where the employer claims the termination was justified by a reduction in force, as contended by Gill here.[5] In *Montana* v. *First Federal S. & L. of Rochester* (2d Cir. 1989) 869 F.2d 100, 105, the court stated: "[W]e decline to apply the

---

[4]Because the antidiscrimination objectives and the public policy purposes of the FEHA and title VII of the Federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) are the same, we refer to federal decisions where appropriate.

[5]Ewing, however, maintains that Gill's reduction in force claim was merely pretextual. (See *Hillebrand* v. *M-Tron Industries, Inc.* (8th Cir. 1987) 827 F.2d 363, 365, in which the court stated that in proving a prima facie case, the plaintiff need not adopt as part of his case the

*McDonnell Douglas* standard inflexibly, and we now hold expressly what our previous decisions have clearly implied: that in a reduction-in-force case or a structural reorganization case, a discharged employee who seeks under *McDonnell Douglas* to establish a prima facie case, need not show that he was replaced by a younger, newly hired employee; it is sufficient that the discharge occur in circumstances giving rise to an inference of age discrimination." Similarly, in another reduction in force case, *Thornbrough* v. *Columbus and Greenville R. Co.* (5th Cir. 1985) 760 F.2d 633, 641-642, the court observed, "The necessary elements of a prima facie employment discrimination case are not Platonic forms, pure and unchanging; rather they vary depending on the facts of a particular case. . . . [S]ince discrimination exists 'in forms as myriad as the creative perverseness of human beings can provide,' [citation], certain specific elements do not constitute 'the alpha and omega' of a prima facie [Age Discrimination in Employment Act of 1967] case [citation]."

Here the instructions were properly tailored to the facts. While Gill transferred some of Ewing's duties at the time of his termination, many of his duties were transferred during a period of two to three years prior to his termination. In July 1983, some of Ewing's promotion and advertising duties were given to Katz. In April 1985, Ewing's duties relating to the pay-per-view movies were given to Harlan. The pay-per-view duties constituted 50 percent of Harlan's work responsibilities. Harlan also received a commission based on the number of subscribers which Ewing had not received. Moreover, the circumstances surrounding the transfer of the pay-per-view duties were additional evidence of age discrimination. Hosfeldt told Ewing that Yearwood thought BAI would boost its sales if it handled the pay-per-view movies. When Ewing questioned Yearwood, he responded that he did not want the additional duties, but that Hosfeldt had told him that Ewing was retiring at the end of the year. Ewing then questioned other executives who gave evasive answers. He confronted Hosfeldt who claimed Yearwood was mistaken and told him that he was "not going to be retired." During this same period, some of Ewing's other functions were transferred to outside vendors under circumstances from which the jury could infer discrimination. Two months before Ewing's termination Gill hired Cotter. After Ewing's termination, his remaining duties, with the exception of Gilline, were distributed among Harlan, Katz and Cotter. We agree with the trial court's observation, "I would have no problem finding as a matter of law that a prima facie case had been made in this case. I don't think there is any problem with that."

Further, jury instructions must be evaluated as a whole in evaluating the impact of a particular instruction. (*Cassino* v. *Reichhold Chemicals, Inc.* (9th

employer's reason for his discharge; thus, the plaintiff who contended that a reduction in force was merely a pretext for his termination need not meet the elements of a reduction in force prima facie case.)

Cir. 1987) 817 F.2d 1338, 1344.) Here the instructions, read in their entirety, informed the jury that Ewing was required to prove that his age was a determining factor in his termination. The trial court gave the "determining factor" instruction to the jury five times. Thus, even assuming there was some ambiguity in the challenged instruction, it was not prejudicial since the instructions, when considered in their entirety, unambiguously required the jury to apply the appropriate standard.

Gill's contention that Ewing was required to prove that a full-time job still existed at the time of his termination seeks to side-step the fact that the majority of Ewing's duties were dispersed before his termination. The cases upon which Gill relies do not support its contention. In *Hall* v. *American Bakeries Co.* (8th Cir. 1989) 873 F.2d 1133, 1135, the district court required the plaintiff to prove "[t]hat his job in its various parts continued to exist." However, the reviewing court did not discuss whether the instructions relating to a prima facie case were correct. "Where . . . a finding of discrimination *vel non* has been made, the appellate court need not concern itself with the order of proof and presumptions, but, rather, should 'simply study the record with a view to determining whether the evidence is sufficient to support whatever finding was made at trial.' [Citation.]" (*Ibid.*)

In *Leichihman* v. *Pickwick Intern.* (8th Cir. 1987) 814 F.2d 1263, 1268, the plaintiff challenged that portion of the instructions which required him to prove "his job in its various parts continued in existence." The reviewing court held the instruction was not error on the facts of that case. Of importance to the instant case, however, is that the court repeatedly stated that instructions relating to a prima facie case will vary depending on the facts of a given case. (*Id.* at pp. 1269-1270.) The court further observed that "[i]t is possible that in some circumstances the showing that age was a determining factor in the employer's action will be sufficient, and the plaintiff need not show that his position continued to exist." (*Id.* at p. 1270.)

In *Rose* v. *Wells Fargo & Co.* (9th Cir. 1990) 902 F.2d 1417, two banks merged resulting in the elimination of duplicative job positions. The plaintiffs challenged the instruction requiring them to prove they were "replaced by a substantially younger employee with equal or inferior qualifications." (*Id.* at p. 1421.) The court first acknowledged that a plaintiff's failure to prove he was replaced by a younger employee was " 'not necessarily fatal' " to a prima facie case. The court then upheld the order granting summary judgment. (*Ibid.*) One of the plaintiffs was unable to show any need for his services by the employer or any other facts giving rise to an inference of age discrimination. (*Id.* at p. 1422.) The other plaintiff established that his duties were assigned to a younger employee six or seven months after his termination. However, the court concluded that "[u]nder these circumstances, 'a

plaintiff must come forward with additional direct, circumstantial, or statistical evidence that age was a factor in his termination.' [Citation.]" (*Ibid.*) Thus, *Rose* is distinguishable factually from the instant case, because here a significant portion of Ewing's duties were transferred prior to his termination under circumstances indicating that age was a determining factor in the decision to terminate him.

In *Raschick* v. *Prudent Supply, Inc.* (8th Cir. 1987) 830 F.2d 1497, the appellate court affirmed the order granting summary judgment in an age discrimination case. The plaintiff attempted to prove "the employer tried to replace the plaintiff with someone else who would provide the same service or skill." (*Id.* at p. 1499.) The court specifically acknowledged that a plaintiff need not always establish this element in order to prove a prima facie case of age discrimination, but noted that the plaintiff had presented his case on appeal within this context. (*Id.* at p. 1499, fn. 3.)

In *Schuler* v. *Polaroid Corp.* (1st Cir. 1988) 848 F.2d 276, 278, quoting *Holt* v. *Gamewell Corp.* (1st Cir. 1986) 797 F.2d 36, 37-38, the court held that one of the elements in a reduction in force case involving age discrimination is either " 'the employer did not treat age neutrally or that younger persons were retained in the same position.' " Thus, the court affirmed the order granting summary judgment where the plaintiff's duties were effectively eliminated, but there was no other evidence relating to age discrimination.

Gill also contends that the trial court's failure to define the term "significant" could have caused the jury to interpret the term as 10 percent, 20 percent or 30 percent of Ewing's duties. We disagree. "Significant" has been defined as "full of import," "having or likely to have influence or effect," "important," "weighty." (Webster's New Internat. Dict. (3d ed. 1981) p. 2116.) Thus, the trial court instructed the jury that Ewing was required to prove that an "important" part of his duties were transferred to younger, less qualified employees.

III. *Motion for Nonsuit*

A. *Standard of Review*

Where a motion for nonsuit is denied and the case is tried on the merits, a reviewing court will review the sufficiency of the evidence to support the jury's verdict, not the sufficiency of the evidence at the time of the nonsuit motion. (*Lowe* v. *San Francisco etc. Ry. Co.* (1908) 154 Cal. 573, 575-576 [98 P. 678].)

1. *Sufficiency of Evidence That Gill's Business Reasons Were Pretexts for Age Discrimination*

Gill contends Ewing failed to present sufficient evidence to support a finding that Gill's business reasons were pretexts for age discrimination.

Where the defendant fails to have the action dismissed for lack of a prima facie case and offers evidence of a legitimate, nondiscriminatory reason for the plaintiff's termination, the presumption of discrimination is rebutted. (*Texas Department of Community Affairs* v. *Burdine, supra,* 450 U.S. 248, 254-255 [67 L.Ed.2d at pp. 215-217].) The plaintiff then retains the burden of proving that "the proffered reason was not the true reason for the employment decision. This burden now merges with the ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination. [He] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. [Citation.]" (*Id.* at p. 256 [67 L.Ed.2d at p. 217].)

In the instant case, Gill introduced evidence that it transferred Ewing's duties relating to the booking of movies for the G Channel to HTN, the production of Gill Cable Guide to TVSM, and the pay-per-view movies and the Classic Movie Channel to BAI for economic reasons. Thus, there was evidence to support the jury's special finding that Gill articulated "a legitimate, nondiscriminatory reason or reasons for [Ewing's] termination." The burden of proof on the age discrimination claim then shifted to Ewing. We conclude there is substantial evidence to support the jury's finding that Ewing was a victim of age discrimination.

In August 1983, Gill transferred Ewing's duties relating to the G Channel to HTN, claiming it saved $230,564. However, there was also evidence that Ewing could have produced the G Channel for far less than the amount charged Gill. Moreover, the movies presented by HTN were of lower quality than those chosen by Ewing.

In May 1984, Gill transferred the production of Gill Cable Guide to TVSM for a cost savings of $619,530. This decision resulted in the termination of several people in the media services department, leaving only Ewing and a secretary. However, Ewing retained several duties in connection with the guide: selecting a cover and photographs; preparing the synopses of movies; obtaining advertising copy from Katz and others; obtaining the list of pay-per-view movies; obtaining the G Channel information from HTN; writing a column; and mailing these materials to TVSM. When he was

terminated, these duties were assumed by younger, less qualified Gill employees.

In May 1984, BAI hired Harlan to promote the Classic Movie Channel, one of Ewing's former duties. Hosfeldt, although aware that Ewing had previously performed this duty, did not suggest that Ewing be considered for the position. Yearwood claimed everyone, including Hosfeldt, was aware Harlan was hired to handle the Classic Movie Channel.

In April 1985, Ewing's duties in connection with the pay-per-view channel were also transferred to Harlan. Although "working" for BAI, Harlan's and his assistant's salaries were paid by Gill. Harlan also received a commission which Ewing never did.

There were also inconsistencies in Hosfeldt's justifications for the transfer of these duties. At the time of the transfer, he claimed Yearwood thought BAI would boost its advertising sales if it handled the pay-per-view movies. When Yearwood disputed this claim, Hosfeldt disagreed with Yearwood and assured Ewing he would not be required to retire. At trial, Hosfeldt claimed to centralize all duties associated with pay-per-view movies at one location.

When Hosfeldt assured Ewing that his position was secure, he and Reichmuth had already decided to terminate him. Hosfeldt claimed that Gill was waiting for a retirement and bonus program to take effect before announcing Ewing's termination. However, there is also evidence from which the jury could draw the inference that Gill expected Ewing to retire and when he did not, Gill terminated him due to his age. Reichmuth was evasive when Ewing confronted him about his retirement. After Ewing asked English, vice-president of finance, whether he would receive a cost-of-living raise, he replied that Ewing would not receive one because he was retiring. Ewing denied that he ever indicated he would retire. Additional age-related remarks were made by English, Glover and other managers. Although these individuals did not make the decision to terminate Ewing and thus their conduct, standing alone, could not support a finding of age discrimination, their comments reflected an atmosphere of age-bias in the company.

When Hosfeldt fired Ewing, he asserted, "[W]e have been systematically phasing out your job here." In making the "organization changes," Ewing was the only one out of eighty employees to be fired in the marketing division. After he was terminated, his duties were transferred to Harlan, Katz, and Cotter.

Moreover, in responding to the claim filed by Ewing at the Department of Fair Employment and Housing (DFEH), Gill made various misleading statements. Gill claimed Ewing's duties relating to the G Channel cost $1.25 per

month per subscriber and Gill saved $.50 per month per subscriber by switching to HTN. However, Gill's own accountant testified that the cost per month per subscriber was $.73 when Ewing handled the G Channel. Gill also claimed that the transfer of the pay-per-view movies to Harlan was more efficient and economical. However, at trial, Hosfeldt testified Gill spent more money when Harlan assumed the pay-per-view movies. Thus, the evidence was sufficient to support a finding that Gill's business reasons were pretexts for age discrimination.

### 2. *Administrative Remedy*

Gill contends that because Ewing voluntarily closed his case with the DFEH, he did not exhaust his administrative remedies and thus is precluded from seeking judicial review.

On June 5, 1987, Ewing filed his claim with the DFEH. On November 15, 1987, more than 150 days later, the DFEH issued him a right-to-sue letter. The letter also indicated that the DFEH had recommended that his case be closed based on Ewing's intention to take the matter to court.

Government Code section 12965, subdivision (b), provides in relevant part: "If an accusation [by the DFEH] is not issued within 150 days after the filing of a complaint, or if the department earlier determines that no accusation will issue, the department shall promptly notify, in writing, the person claiming to be aggrieved. Such notice shall indicate that the person claiming to be aggrieved may bring a civil action under this part against the person, employer, . . . named in the verified complaint within one year from the date of such notice." Thus, the statute requires the DFEH to provide a complainant with a right-to-sue letter if it does not issue an accusation within 150 days. The California Supreme Court recently recognized this procedure in *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 72 [276 Cal.Rptr. 130, 801 P.2d 373], where it stated: "If no accusation is issued within 150 days after the filing of a complaint, . . . the Department must give the complainant a 'right to sue' letter." (See also *Takahashi* v. *Board of Education* (1988) 202 Cal.App.3d 1464, 1480 [249 Cal.Rptr. 578].)

Here the DFEH complied with the requirements of Government Code section 12965, subdivision (b), by issuing the right-to-sue letter in a timely fashion. When Ewing received the letter, he had exhausted his administrative remedy with the DFEH and was entitled to pursue his claim in court. The fact that he had requested the closing of his case is irrelevant. As the court stated in *Carter* v. *Smith Food King* (9th Cir. 1985) 765 F.2d 916, 923, "We also reject any implication that because an individual is issued a right-to-sue

letter at his request it somehow follows that he has failed to exhaust his administrative remedies."

The cases relied upon by Gill are distinguishable, since they do not involve interpretation of Government Code section 12965, subdivision (b). (See *Commodore Home Systems, Inc.* v. *Superior Court* (1982) 32 Cal.3d 211 [185 Cal.Rptr. 270, 649 P.2d 912]; *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715]; *San Bernardino Valley Audubon Society, Inc.* v. *County of San Bernardino* (1984) 155 Cal.App.3d 738 [202 Cal.Rptr. 423]; *McHugh* v. *County of Santa Cruz* (1973) 33 Cal.App.3d 533 [109 Cal.Rptr. 149]; *Woodard* v. *Broadway Fed. S. & L. Assn.* (1952) 111 Cal.App.2d 218 [244 P.2d 467].)

IV., V.*

. . . . . . . . . . . . . . . . . . . . . . . . .

*Disposition*

The judgment is modified to reduce the award of damages by $13,555. In all other respects, the judgment is affirmed. Each party to bear their own costs on appeal.

Elia, J., and Bamattre-Manoukian, J., concurred.

---

*See footnote, *ante*, page 601.