Filed 2/11/14  Balogun v. Los Angeles Unif. School Dist. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| WAHEED BALOGUN, | B243168 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC445040) |
| v. | |
| LOS ANGELES UNIFIED SCHOOL DISTRICT, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, James R. Dunn, Judge.  Affirmed.

Ivie, McNeill & Wyatt, Rupert A. Byrdsong, for Defendant and Appellant.

Law Offices of Jeffrey C. McIntyre, Jeffrey C. McIntyre, for Plaintiff and Respondent.

In December 2009, the Facilities Branch of the Los Angeles Unified School District ("LAUSD" or the "District") laid off all eight of its Regional Project Management Directors, including plaintiff Waheed Balogun. Plaintiff claimed that the position-wide layoff was implemented in order to rid the Facilities Branch of certain employees who had previously sued the District for violations of the Fair Employment and Housing Act, Government Code section 12940 et seq. ("FEHA"), and who had supported coworkers in prosecuting similar claims. Plaintiff sued the District alleging causes of action for racial discrimination, national origin/ancestry discrimination, associational discrimination, retaliation, and failure to prevent discrimination or retaliation, all under FEHA.

Plaintiff prevailed at a jury trial on the last three of these causes of action. LAUSD appeals the judgment, citing a lack of evidence to support plaintiff's associational discrimination and retaliation claims, a failure to mitigate damages, and additional errors during the course of the trial. Finding no error, we affirm the judgment.

FACTUAL AND PROCEDURAL SUMMARY[1]

Plaintiff, originally from Nigeria, is a black naturalized American citizen. He earned a diploma in civil engineering in Nigeria, bachelor's degrees in environmental design and architecture from the University of Minnesota, and a master's degree in educational administration from California State University, Los Angeles.

In 1988, plaintiff started working in the Facilities Branch of LAUSD as a Building Specifications Writer. In January 2001, he became a Regional Project Management Director or RPMD. RPMDs were members of middle management who oversaw new construction, additions and remodeling of LAUSD schools. They typically supervised a

---

[1] In accordance with the usual rules of appellate review, we summarize the facts in the light most favorable to the judgment. (See *Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1658.)

2

large staff of LAUSD employees and outside consultants, and were charged with managing the construction projects.

The Facilities Branch was home to eight RMPDs, each in charge of a single region, until 2009, when a reorganization reduced the number of regions from eight to three. Plaintiff was one of three RPMDs assigned a region in the reorganized department.

From 2004 to 2007, plaintiff was one of several LAUSD employees involved in litigation with the District which alleged racial discrimination in awarding promotions. Paul Metoyer, another black RPMD, was also a plaintiff in that litigation. LAUSD settled the litigation with plaintiff and his colleagues in 2007.

In 2008, plaintiff testified in a deposition in the case of several other minority employees of the Facilities Branch who were also claiming racial discrimination in regard to promotions (the "2008 Litigation"). Plaintiff and Metoyer were included in the plaintiffs' Witness List. Two members of LAUSD's upper management, Neil Gamble and Roger Finstad, were also deposed in the litigation and were listed as witnesses in that case. The 2008 Litigation involved allegations that Gamble and Finstad had engaged in discrimination against the plaintiffs in awarding promotions. The lawsuit was settled in approximately late summer of 2008.

Finstad testified that when lawsuits are brought by a Facilities employee at LAUSD, the facts of the lawsuit and the settlement terms are discussed with the management personnel involved. Managers would be updated on the litigation. A long-time LAUSD manager testified that he heard discussions in the office among District upper management, including Gamble, about the earlier lawsuit brought by plaintiff and Metoyer. Gamble and Finstad acknowledged that they were aware of Metoyer's prior lawsuit, although they claimed not to know of plaintiff's involvement in it.

In early 2009, plaintiff was shown a purported "performance evaluation" which a coworker had seen in his personnel file. Plaintiff had never seen the evaluation before. The document was prepared by Finstad in late 2008 or early 2009, after plaintiff was

deposed and listed as a trial witness in the 2008 Litigation, and stated that he was a marginal employee with low ratings.

At trial, Finstad acknowledged that the form was not LAUSD's standard performance evaluation form, but one he personally created to simulate an official form. Finstad was not plaintiff's supervisor, and did not discuss the evaluation with plaintiff. In his deposition, Finstad testified that he never talked to anyone reporting to plaintiff concerning his performance. At trial, he contradicted this testimony, stating that he spoke to "a range of people that worked" for plaintiff, although he could not "remember specifically which ones."

Also in late 2008 and thereafter, plaintiff's fellow RPMD and former co-plaintiff, Paul Metoyer, was subjected to a number of negative employment actions, including an audit of programs assigned to him; removal of supervisory duties; investigation of his attendance; and a downgrading and relocation of his office work station. None of the investigations resulted in a finding of wrongdoing by Metoyer.

Michael Brady, the Deputy Director of Maintenance for the Facilities Branch, an upper management position which reported to Neil Gamble, had a series of conversations with Gamble in early to mid-2009 concerning reorganization of the Facilities staff, including the RPMDs. Brady indicated that he could possibly use the services of one or more RPMDs if they were available. Gamble responded that regardless of staffing needs, he intended to eliminate all of the positions and to assign the work to outside consultants. When asked why valuable employees would be laid off when there was work to be done, Gamble explained some RPMDs were causing problems; consequently, he intended to layoff all employees holding the position of RPMD. The nature of those problems was not identified. Although Brady replied that such a course of action made no sense, and that high-performing RPMDs should not be subject to lay off simply because some of their colleagues had problems, Gamble indicated that the layoffs were nevertheless going to proceed. At trial, Gamble testified that he had no issues with the performance of Balogun or Metoyer.

4

In the summer of 2009, Brady had a conversation with Terry Dillon about staffing changes affecting the RPMDs. Dillon confirmed that the RPDMs were not going to remain on the Facilities payroll. Dillon indicated that "although he would like to keep some, the ones that he would like to keep were not necessarily the best ones, or the ones – the more senior ones they might have issues with. So keeping them wouldn't work out." Again, Brady stated that "if the work is still there, they should keep some of them on." He also indicated that he did not believe that a layoff was an appropriate way to get rid of employees with performance issues. Dillon neither agreed nor disagreed with Brady's opinion, but "just indicated that they were having problems with some of the people they would have to keep so they weren't keeping any of them." Dillon identified Metoyer as one of the RPMDs who would have to be retained absent a position-wide layoff.

A workload analysis prepared by LAUSD in May 2009 showed that there was sufficient work for all of the RPMD positions to continue indefinitely into the future.

In September 2009, Dillon notified Gamble and James Sohn, the head of Facilities, that the decision had been made to lay off the RPMDs, and that the three geographical districts, including plaintiff's, would be assigned to outside contractors. This decision violated LAUSD's prohibition against assigning to an outside contractor work which could be completed by an employee. Consultants were indeed retained to perform work previously performed by the RPMDs, at a substantially greater cost to the District.

A workload analysis prepared by LAUSD in October 2009 after the layoffs were announced to upper management estimated that there would be sufficient work to employ the RPMDs until June 2011.

After the layoff decision had been made, Dillon was contacted about placing plaintiff in a vacant position, which had been authorized to be filled by the Assistant Budget Director and the fiscal staff. After Dillon was contacted, the position was closed without explanation and plaintiff was placed back into the layoff.

5

Plaintiff took additional steps to continue his employment with LAUSD, but was unsuccessful. Because he needed a source of income and had determined that there were no opportunities at LAUSD, plaintiff requested that he start receiving his pension benefits the day after the effective date of the layoff.

All of the RPMD positions were eliminated; no RPMDs were called back to work.

After learning of his termination, plaintiff sought alternate employment. He was hired by West Contra Costa School District in May 2010 at a salary $111,000, or $18,000 less than he earned at the District. After this employment began, plaintiff learned that once he had worked 960 hours, he would be required to pay back $30,000 to CalPERS, something he was financially unable to do. He therefore resigned his position and moved to Texas, where he believed his prospects were better and where he could continue to receive his pension even if he were employed. Plaintiff was not able, however, to obtain comparable employment in Texas.

On September 3, 2010, plaintiff filed suit against LAUSD, alleging causes of action for racial discrimination, national origin/ancestry discrimination, association discrimination, retaliation and failure to prevent discrimination or retaliation, all under FEHA.

The matter was tried to a jury, which returned a verdict in plaintiff's favor on his causes of action for associational discrimination, retaliation, and failure to prevent discrimination and retaliation from occurring or continuing. Plaintiff was awarded $211,765 in damages. The trial court denied LAUSD's motions for judgment notwithstanding the verdict.

The District timely filed its Notice of Appeal.

DISCUSSION

1. *Substantial evidence supports the jury's finding of associational discrimination and retaliation*

On appeal from a jury verdict, great deference is accorded the jury's conclusions. "'[T]he scope of our review begins and ends with the determination whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, which will support the conclusions reached by the jury. [Citations.] In reviewing the voluminous record, we must examine all factual matters in the light most favorable to the prevailing parties and resolve all conflicts in support of the judgment. [Citations.] [¶] "Substantial" evidence, however, is not synonymous with "any" evidence. To constitute sufficient substantiality to support the verdict, the evidence must be "reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." [Citations .]' [Citation.] 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. [Citations.]' . . . [¶] . . . 'While substantial evidence may consist of inferences, such inferences must be "a product of logic and reason" and "must rest on the evidence" [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding [citations].' [Citation.]" (*Kasparian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 259-260.)

It is within the exclusive province of the trier of fact to determine credibility. (*Sabbah v. Sabbah* (2007) 151 Cal.App.4th 818, 823. "[T]he testimony of a witness whom the trier of fact believes, whether contradicted or uncontradicted, is substantial evidence, and we must defer to the [trier of fact's] determination that these witnesses were credible." (*Estate of Odian* (2006) 145 Cal.App.4th 152, 168.)

LAUSD contends that "plaintiff failed to submit any evidence that the District's reduction in force was not based on legitimate and real financial reasons. Moreover, plaintiff affirmed that the District was required to eliminate staff, even as he eliminated staff within his own division, to deal with the financial situation. Consequently, the fact

7

finder had no conflict of evidence to resolve in plaintiff's favor." The argument misunderstands the theory of plaintiff's case and flies in the face of the evidence presented at trial.

Plaintiff did not contend that the District had no reason to cut any of the eight RPMD positions; rather, he acknowledged the District had a legitimate reason to reduce the number of RPMDs employed in the Facilities Branch. He maintained, however, that the District had the need and the funding for two or three of those positions, and that instead of laying off the RPMDs in order of their seniority in accordance with LAUSD policy, the District laid off all eight RPMDs and contracted for outside consultants to perform the very same work that the few remaining RPMDs would have performed had they not been laid off. He further contended that the District chose this course of action solely because it wanted to terminate the employment of two particular RPMDs, plaintiff and Metoyer, because they caused trouble by complaining about the District's employment practices vis-à-vis minorities and supported co-workers who sued to vindicate their employment rights.

Plaintiff submitted substantial evidence in support of his causes of action for associational discrimination and retaliation. Most damning was the testimony of Michael Brady, who testified that two Facilities Branch decisionmakers, Dillon and Gamble, told him that although they would have kept some of the RPMDs, they chose to eliminate all eight of them because seniority rules would require them to retain RPMDs who were causing them problems. Dillon specifically identified Metoyer as one of the problem employees. Plaintiff, Metoyer, and a third employee were the most senior RPMDs, having been hired on the same date. Both Metoyer and plaintiff were black, both had filed a discrimination suit against the District, and both had assisted other black employees in their racial discrimination lawsuit. Furthermore, there was no evidence that either plaintiff or Metoyer had any performance issues. Indeed, Gamble admitted that both were good employees.

8

From the foregoing evidence the jury could reasonably infer that, although the Facilities Branch was required to lay off some but not all its RPMDs for financial reasons, had the branch followed District procedures, plaintiff and Metoyer would have been retained, as they were the most senior persons in those positions, and were known to be good employees.  Further, the jury could fairly conclude that the reason management did not follow District procedures in this instance, but rather violated the rules against retaining consultants to perform work employees were capable of performing, was because plaintiff and Metoyer had made trouble for management by bringing charges of racial discrimination against the District, and by testifying in support of their coworkers' discrimination claims.

In short, plaintiff maintained that the layoff was a subterfuge for his wrongful discharge.  It is well established that "an employer may very well implement an economically necessary reduction in force and still, at the same time, violate antidiscrimination laws because the *selection* of who is to be laid off is based on some illegal criteria."  (*O'Mary v. Mitsubishi Electronics America, Inc.* (1997) 59 Cal.App.4th 563, 580.)  Substantial evidence supports the jury's determination that the District implemented its fiscally necessary reduction in force in a discriminatory fashion.

LAUSD also maintains that plaintiff failed to substantiate his claim of retaliation because there was no evidence that his employer was aware that he had engaged in protected activity.  Specifically, the District argues that "Terry Dillon was the decision maker and had the authority to eliminate the RPMD position.  He was not aware of any lawsuits or involvement in other suits.  This fact absolutely negates any possible retaliatory motive that Terry Dillon could have formed."  The argument is unpersuasive.

Contrary to LAUSD's assertion, Dillon was not the sole decisionmaker.  As Gamble testified at trial, a number of persons participated in the planning that led to the elimination of the RPMDs.  Gamble also testified to his numerous conversations with Dillon, and that the two of them decided to eliminate the RPMDs.

The record contains substantial evidence that the District knew of plaintiff's protected activities. There was testimony that managers at LAUSD received updates about cases in which they were involved. Thus, Gamble would have received updates about plaintiff's involvement as a witness for the plaintiffs in the 2008 Litigation. Both Gamble and Finstad acknowledged that they were aware of Metoyer's prior discrimination lawsuit, a suit in which Balogun was associated as a plaintiff. And of course, the jury was free to reject Dillon's self-serving statement that he was unaware of plaintiff's protected activities.

2. *Finstad's performance evaluation of plaintiff was properly admitted into evidence*

"Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion. (*People v. Williams* (1997) 16 Cal.4th 153, 196–197 ['In determining the admissibility of evidence, the trial court has broad discretion. . . . On appeal, a trial court's decision to admit or not admit evidence, whether made in limine or following a hearing pursuant to Evidence Code section 402, is reviewed for abuse of discretion.']; accord, *People v. Alvarez* (1996) 14 Cal.4th 155, 203 ['appellate court reviews any ruling by a trial court as to the admissibility of evidence for abuse of discretion']; *Zhou v. Unisource Worldwide, Inc.* (2007) 157 Cal.App.4th 1471, 1476.)" (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)

The District filed an in limine motion to exclude evidence concerning what it termed "an alleged performance evaluation" prepared by Roger Finstad. The context of this evidence is as follows: The plaintiffs in the 2008 Litigation complained that they were denied promotions at the District on account of their race. Finstad was involved in the decisionmaking process of the employment decisions underlying the plaintiffs' claims. As such, he appeared on the District's witness list, and was kept apprised of the status of the litigation. Plaintiff and Metoyer were listed as witnesses by the plaintiffs in

the 2008 Litigation. Finstad was aware of Metoyer's earlier lawsuit against the District. The 2008 Litigation was settled in the approximately August of 2008.

In late 2008 or early 2009, Finstad completed a performance evaluation of plaintiff, purportedly at the request of Scott Lewis, a higher-level manager in the Facilities organization to whom the RPMDs reported. This procedure was atypical, as plaintiff did not report to Finstad, but rather to Lewis. In preparing the evaluation, Finstad initially testified that he spoke to neither plaintiff nor his superiors nor anyone who reported to him, then later claimed to have spoken to others, whom he could not specifically recall. Finstad testified that it was "not a very flattering performance evaluation," and that he rated plaintiff's performance as "marginal." Plaintiff learned of the evaluation when a coworker told him he had seen it in plaintiff's personnel file. The evaluation was apparently removed from the file at some point in time; it was not produced in discovery or admitted into evidence.[2] In all of his years at the District, plaintiff had never received a negative performance evaluation; indeed, the District acknowledged that there were no deficiencies in plaintiff's job performance.

The District sought to exclude the evidence of "an alleged performance evaluation . . . on the grounds that there is no evidence that the alleged evaluation related in any way to the decision to eliminate the RPMD classification." The District surmised that plaintiff would contend "that the alleged performance evaluation was considered by the District when the decision was made to eliminate the RPMD position." "LAUSD seeks to exclude any inflammatory speculation that the elimination of the RPMD position was related in any fashion whatsoever to the evaluation."

An unwarranted negative performance evaluation which did not conform to the normal personnel practices of the organization and was placed in an employee's personnel file without his knowledge is evidence that the evaluator or those requesting the evaluation were seeking to create a paper trail to support an adverse employment

_____

[2] We so conclude based on the District's characterization of this document as the "alleged" or "phantom" performance evaluation.

11

action which would not be supportable in the absence of the fabricated evidence. The evaluation is no less relevant to the state of mind of those responsible for its creation simply because it was not cited by the decisionmakers as a reason for termination of plaintiff's employment. Evidence of other acts of discrimination or retaliation, even if not engaged in by the actual decisionmakers, is relevant to show the atmosphere in which decisions were made. (*Walden v. Georgia-Pacific Corp.* (1997) 126 F.3d 506, 521; *Ewing v. Gill Industries, Inc.* (1992) 3 Cal.App.4th 601, 615.)

In sum, evidence of Finstad's unorthodox evaluation of plaintiff's performance was properly admitted at trial.


3. *Plaintiff suffered an adverse employment action*

LAUSD contends that since plaintiff retired from the District in January 2010, he did not suffer an adverse employment action. The contention is frivolous.

The District states that "Plaintiff's admission that he retired instead of getting terminated negates his adverse employment action." This misrepresents plaintiff's testimony. Plaintiff testified at length to his attempts to locate another position within the District to avoid being laid off, and made clear that he scheduled his retirement to begin on the day after his layoff became effective only because he had no other source of income. He had not intended to retire, but planned on continuing to work at LAUSD. In short, the record is replete with evidence that plaintiff suffered an adverse employment action.


4. *The damage award was supported by the evidence*

Finally, LAUSD contends that, by resigning from his subsequent employment with West Contra Costa School District, plaintiff failed to mitigate his damages and is consequently not entitled to recover damages for future loss of income. Again, the contention lacks merit.

12

The burden is on the employer to prove the amounts the employee could have reasonably earned by obtaining comparable employment through reasonable efforts. (*Parker v. Twentieth Century Fox Film Corp.* (1970) 3 Cal.3d 176, 181-182.) Whether a plaintiff acted reasonably in mitigating damages is normally a question of fact. (*West v. Bechtel Corp.* (2002) 96 Cal.App.4th 966, 985.)

Plaintiff testified that although he began working for the School District in Contra Costa County in May 2010, he learned that if and when he exceeded 960 hours, or six months, of work he would be required to pay back $30,000 to CalPERS, something he could not afford to do. Instead, plaintiff decided to move to Texas, in hopes of securing another job while lowering his cost of living and continuing to receive his pension.

Despite having the burden of proof, the District produced no evidence that the Contra Costa job was comparable to plaintiff's employment with LAUSD; indeed, it is undisputed that the location was not comparable. Nor did the District offer evidence that plaintiff acted unreasonably or in bad faith by leaving the Contra Costa position when he learned that he would be required to repay $30,000 to his pension plan, a sum he testified he could not afford. In sum, the District failed to meet its burden to prove that plaintiff could have obtained reasonably comparable employment in the Los Angeles area had he but sought to do so.

DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MINK, J.[*]


We concur:


TURNER, P. J.


KRIEGLER, J.

---

[*] Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.