[No. H013353. Sixth Dist. May 3, 1996.]

JEFFREY S. HEARD, Plaintiff and Appellant, v.
LOCKHEED MISSILES & SPACE CO., INC., et al., Defendants and
Respondents.

**COUNSEL**

William N. Woodson III and Thomas E. Kotoske for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Daniel P. Westman, Anna E. Goodwin, Angela M. Nolan and Thomas A. Counts for Defendants and Respondents.

**OPINION**

**ELIA, J.**—Jeffrey S. Heard filed suit against Lockheed Missiles & Space Co., Inc. (Lockheed), alleging that Lockheed discriminated against him based upon his race. Heard alleged claims for disparate treatment and retaliation.

After a jury trial, the jurors were told to respond to questions set forth in the special verdict. In response to the first special verdict question on the

issue of race discrimination—"Did plaintiff prove by a preponderance of the evidence that a *prima facie* case of discrimination existed concerning the terms and conditions of his employment as they existed prior to December 31, 1991?"—the jurors responded "yes." In response to the second special verdict question—"Did plaintiff establish by a preponderance of the evidence that similarly situated non-African-American employees, as defined under the California Fair Employment and Housing Act, were treated differentially in the terms and conditions of their employment prior to December 31, 1991?"—the jurors answered "no." The jurors were then instructed to consider the special verdict questions regarding Heard's retaliation claim. In response to those questions, the jurors found for Lockheed.

Judgment was entered for Lockheed and Heard appeals. Among other things, Heard argues the jury was incorrectly instructed that he was required to establish as part of his prima facie case that similarly situated non-African-American employees received the employment terms and conditions that Heard sought. Heard also contends he was the prevailing party because the jurors found in the special verdict that he established a prima facie case of race discrimination.

For reasons we shall explain, we will reverse.

*Factual and Procedural Background*

Heard is an African-American male. He graduated from San Jose State University in 1983 with a bachelor's degree in radio and television broadcasting. In 1984, Heard began working for Lockheed.

Heard worked in Lockheed's missiles systems division (MSD) training department making video training packages regarding the Fleet Ballistic Missile. The films were produced for both the military and Lockheed employees.

Lockheed held a "top secret" facility security clearance from the United States Department of Defense (DOD) Defense Investigative Service. To retain that clearance, Lockheed was required to comply with the DOD industrial security manual (Manual). The Manual required that Lockheed report to the DOD "adverse information" about employees with clearances. Adverse information included criminal activities and the illegal use of drugs. Once adverse information was submitted, the DOD conducted an investigation, and could revoke the employee's clearance.

Since 1985, Heard had a security clearance to perform his duties. Heard was required to travel to high-security military bases in order to tape footage for the training films.

In 1985, Heard's superior stated, "Jeff's production skills are very good . . . ." By 1986, Heard was producing approximately 15 video training films. By 1987, Heard was producing video films on nuclear warheads. His performance was rated "fully effective" to "highly effective."

In 1987, Heard was arrested and charged with possessing 56 grams of cocaine. Subsequently, the criminal charge related to Heard's arrest was "thrown out of court." Heard did not inform his manager, Elmer Stovall, of his arrest.

In 1988, after his arrest, Heard voluntarily entered drug rehabilitation which he successfully completed. Heard completed the program in 1989 but continued to counsel other individuals with drug problems.

From 1987 to 1990, Heard continued to work at Lockheed producing videos for the military. By 1988, Heard's performance was rated "fully effective" to "highly effective." Heard's superior stated, "Another area Jeff excelled in was his performance as ethics training facilitator. His evaluations were outstanding. Appreciate Jeff's willingness and versatility. Thanks, Jeff."

In 1989, Heard received special recognition for his outstanding performance: "I would like to recognize and commend the efforts of Jeff Heard in support of the MSD Training Television Network. In the last month Jeff has demonstrated versatility, diligence and a positive attitude in adapting to the various tasks to which he has been assigned." In August 1989, the manager of Lockheed's weapon systems plans and evaluation also commended Heard's outstanding performance.

Heard's performance review for 1989 rated his performance as "highly effective" to "exceptional." In November 1989, Heard received special recognition for his outstanding performance from the director of system concepts and analysis. In 1989, Heard received an award from Lockheed's management association for his work in the community with "at-risk" children. In March 1990, Heard received special recognition for his performance, along with the other members of his team, from the manager of the missiles space division. In June 1990, the president of Lockheed missiles system division presented Heard with an award for outstanding performance. By June 1990, Heard's yearly performance review rated Heard's performance as "highly effective" to "exceptional."

In December 1990, the charges relating to Heard's 1987 arrest for possessing cocaine were reinstated.[1] Heard pleaded guilty to the charges. On December 11, 1990, Heard was sentenced to one year in county jail (unsuspended), three years probation, and fined $100. The court also ordered Heard to undergo substance abuse counseling. Heard's jail sentence was stayed until February 27, 1991, and stayed again after that. On December 13, 1991, the court suspended the jail sentence.

On December 17, 1990, Heard first advised Stovall, his manager, of his conviction and sentence. Stovall, who is African-American, informed Lockheed's government security department about Heard's conviction. The government security department reported the conviction to the DOD as "adverse information."

Heard testified that Stovall checked with Lockheed's legal department concerning Heard's conviction. According to Heard, the legal department informed Stovall that under the circumstances there was nothing to prevent Heard from continuing his employment with Lockheed as usual.

Stovall testified that he reassigned Heard to projects which did not involve classified work or travel. Stovall decided to remove Heard from the START program, which involved a trip to the White House. With respect to removing Heard from the START treaty trip to the White House, Heard admitted that "I think that Mr. Stovall did the right thing due to the subject at hand."

Stovall consulted "extensively" with Heard about the effect of the conviction on Heard's career. He told Heard that "in any classified program it would be very difficult for him to . . . be evaluated as good a prospect as someone who had not been convicted or had a felony."

By December 1990, Stovall was no longer the manager of Heard's department.

In early 1991, Joseph Parisi became the manager of Heard's department. Parisi is Caucasian.

Heard alleged that Parisi took four discriminatory employment actions against Heard based on Heard's race: these were (1) travel restrictions; (2) Heard's performance appraisal; (3) his "stack" position; and (4) his merit wage increase.

---

[1]Although it is not part of the record, we note that after the criminal charges were dismissed, the People appealed to this court. We reversed, and in 1990, the charges against Heard were reinstated.

According to Heard, Parisi restacked or reranked the department. Heard was ranked near the bottom of the stacking. Heard was therefore vulnerable to being laid off. Heard also testified that Parisi denied Heard a pay raise. The raise was given to other employees in the department. Heard testified that Parisi unnecessarily restricted Heard's ability to travel in connection with his work. Finally, Heard testified that Parisi gave Heard a false performance review.

Heard testified that he complained to Parisi. Heard told Parisi that he thought Parisi's actions were based upon Heard's race. Heard believed Parisi was racist. Heard testified that Parisi never attended the award ceremonies recognizing Heard's receipt of performance awards. Heard testified that Parisi told Heard he was lazy. According to Heard, Parisi's belief that he was lazy was based upon Heard's race.

At Parisi's first meeting with the supervisors of the department, supervisor Mel Jones, who is African-American, testified that Parisi stated that "minorities in the organization are low performers." According to Jones, this statement was dramatic. Jones also stated that he told Parisi there was absolutely no basis for such a statement. Jones said he met with Richard Cannon, who was manager of MSD human resources, to discuss Parisi's statement about minorities being low performers.

Chris Fleming, who is African-American, testified that Parisi said "the management of the organization was all screwed up." According to Fleming, Parisi was referring to Stovall, who was African-American. Fleming testified that Parisi did not attend a ceremony recognizing Fleming's receipt of a performance award. Fleming testified that Parisi attended the award ceremonies of "white" employees. Fleming stated that he felt that Parisi devalued Fleming's work. Fleming testified that Parisi referred to Stovall as "wonton," "as in . . . wonton, Chinese fortune cookie." Fleming testified that he had heard Parisi tell racial jokes. There was evidence that Fleming was ranked number one in the department before Parisi became manager. After Parisi became manager, Fleming dropped to number six.

There was evidence that Heard complained to Parisi about Parisi's racist conduct. Mel Jones also complained to members of Lockheed's management about Parisi's racist conduct. Parisi himself acknowledged that there were complaints of racism concerning his conduct.

Parisi testified. With respect to stacking, Parisi stated that the restacking occurred after he consulted with three other Lockheed supervisors. Parisi testified that he did not move any employee from the stack positions agreed

upon by the three supervisors. Parisi also stated that he relied on his supervisors to assess employees' performance because he was new and he did not know many people in MSD training. After the consultation and discussion among supervisors, and without any objection from any supervisor, Heard was ranked 47th out of 49th. With respect to the travel restrictions, Parisi believed that continuing the restrictions would be in Lockheed's best interest given the fact of Heard's conviction. Parisi decided that the five lowest stacked employees, including Heard, did not deserve a merit increase. Besides Heard, the employees included three Caucasians and a Hispanic.

Thomas Buckley, one of Heard's supervisors, testified that in his opinion Heard was less valuable because Heard was unable to work on key projects because of the possibility he would be sentenced. Buckley testified regarding Heard's salaried performance appraisal. Buckley stated that Heard's technical breadth rating had been lowered because Heard could not work in the field due to the travel restrictions. Buckley stated that Heard received a very low mark in the category of "reason and judgment" because of "his conviction, his involvement with drugs, which in fact imposed a difficulty on his working at Lockheed and within my group."

After Heard complained to Lockheed's human resources department (DHR), an investigation was undertaken. The Lockheed investigator was Linda Malik. Malik's report was admitted into evidence. Her report included the following findings.

With respect to the travel restrictions, the report stated that Parisi restricted Heard's travel in March or April 1991. The report found that Rich Cannon advised Parisi that there was no basis for the travel restriction. According to the report, restricting Heard's travel would make Heard less valuable to the department, cause Heard to drop on the ranking chart, and make Heard vulnerable to adverse employment action. According to the report, after Parisi sought advice from DHR, Parisi nonetheless restricted Heard's traveling privileges.

With respect to the salaried performance appraisal (SPA) and stacking, the report noted that Heard's overall job performance ranking had dropped significantly even though "Boxes marked are not compatible with reviewer comments on SPA." The report noted that there was no counseling or documentation supporting the severe drop in job performance.

According to the report, "From June '90 through March '91 Jeff was at least a fully effective employee per E. Stovall. In fact, E. Stovall does not recall the supervisor, T. Buckley ever mentioning to him that J. Heard's

performance was a problem and Stovall was the manager for ten (10) months of the review period."

With respect to new job assignments, the report concluded that Heard's current assignments restricted him from traveling, thereby requiring that he work on temporary projects and job assignments which involved less meaningful tasks. With respect to the merit increase, the report found that the failure to give Heard a merit increase was not justifiable.

The report recommended returning Heard to his original job assignment before the travel restrictions were imposed. It also recommended revising the SPA and approving a merit increase.

In October 1991, after consultation with Heard's management, a revised SPA and a 2.58 percent merit increase was negotiated for Heard. Parisi agreed to the revised SPA.

Heard rejected this SPA and subsequently filed his administrative charge with the Department of Fair Employment and Housing alleging discrimination based upon race. Heard subsequently filed his complaint. It included a cause of action for race discrimination. Heard also alleged that Lockheed's failure to give him a "departmental average" raise of 5 percent was in retaliation for his earlier complaint of race discrimination.

After this evidence was presented, the case was submitted to the jury. With respect to Heard's race discrimination claim, the jury was instructed that Heard had the burden of proving a prima facie case of discrimination. The jury was instructed that Heard's prima facie case included proof that similarly situated non-African-American employees received the employment terms and conditions sought by Heard. The jury was instructed that if Heard established the prima facie case, then it was Lockheed's burden to state a reasonable nondiscriminatory basis for its employment actions. The jury was instructed that if Lockheed stated a legitimate nondiscriminatory basis for its employment action, then it was Heard's burden to establish by a preponderance of the evidence that Lockheed's reasons were pretextual.[2]

The jury's special verdict questions on the issue of race discrimination provided, in pertinent part, "Did plaintiff prove by a preponderance of the

---

[2]The trial court instructed the jury:

"With respect to the claim that the plaintiff was denied certain terms and conditions of employment due to race discrimination in violation of the California Fair Employment and Housing Act, plaintiff must prove by a preponderance of the evidence all of the facts necessary to establish the following:

"1. That he was qualified and eligible for the term or condition sought;

"2. That he was denied the term or condition of employment that he was eligible to receive;

evidence that a *prima facie* case of discrimination existed concerning the terms and conditions of his employment as they existed prior to December 31, 1991?" The jurors answered "yes" to this question.

The second special verdict question provided, "Did plaintiff establish by a preponderance of the evidence that similarly situated non-African-American employees, as defined under the California Fair Employment and Housing Act, were treated differentially in the terms and conditions of their employment prior to December 31, 1991?" The jurors answered this question "no."

With respect to Heard's retaliation claim, the jurors found in favor of Lockheed.

After the verdict, Heard moved to enter judgment in his favor as the prevailing party on the issue of race discrimination. The motion was denied. Judgment was entered for Lockheed. Heard's subsequent new trial motion was also denied.

This appeal ensued.

---

"3. That similarly situated non African-American employees received the terms and conditions sought by plaintiff;

"4. That race was a determining factor in the denial of the term or condition of employment;

"5. That the denial of the term or condition of employment caused damage to him;

"6. The nature extent and amount of the damages to have been so suffered.

"If you find that plaintiff has failed to prove each of the elements necessary to prove his case, you must decide in favor of [Lockheed] on plaintiff's discrimination claim."

"If you find that plaintiff has established by a preponderance of the evidence all of these necessary elements, then the defendant has the burden of stating a reasonable, nondiscriminatory basis for the action taken towards the plaintiff.

"If you find that the defendant has stated a reasonable, nondiscriminatory basis for their actions, plaintiff then bears the burden of establishing by a preponderance of the evidence that [Lockheed's] stated reasons are not true or are a pretext for discrimination. When I use the word pretext, I mean that [Lockheed's] actions were not really based upon the reasons stated. If plaintiff proves that [Lockheed's] stated reasons are a pretext, you must find for plaintiff.

"On the other hand, if plaintiff fails to establish by a preponderance of the evidence that the reasons stated by [Lockheed] were a pretext, then you must render a verdict in favor of [Lockheed] and against plaintiff. The ultimate burden of proof rests upon the plaintiff at all times."

In addition, the special verdict provided, in pertinent part, "QUESTION No. 1: Did plaintiff prove by a preponderance of the evidence that a *prima facie* case of discrimination existed concerning the terms and conditions of his employment as they existed prior to December 31, 1991?" In response to this question, the jury answered "yes."

The next special verdict question provided, "QUESTION No. 2: Did plaintiff establish by a preponderance of the evidence that similarly situated non-African-American employees, as defined under the California Fair Employment and Housing Act, were treated differentially in the terms and conditions of their employment prior to December 31, 1991?" In response to this question, the jury answered "no." Because the jury answered "no," the jury's consideration of Heard's race discrimination claim ended.

*Standard of Review*

"A judgment or order of the lower court is presumed correct. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error." (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 268, p. 276.)

In reviewing a challenge to the sufficiency of the evidence, we are bound by the substantial evidence rule. All factual matters must be viewed in favor of the prevailing party and in support of the judgment. All conflicts in the evidence must be resolved in favor of the judgment. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480].)

## DISCUSSION

*Jury Instruction/Special Verdict*

Heard argues the jury should not have been instructed that he was required to prove as part of his prima facie case that similarly situated non-African-Americans received the employment terms and conditions that he sought. We agree. Before explaining our conclusion, we first review the pertinent legal principles.

In 1959, the California Fair Employment Practices Act (FEPA) was enacted and then recodified in 1980 as part of the Fair Employment and Housing Act (FEHA). (Stats. 1980, ch. 992, § 4, p. 3140; Gov. Code, § 12900 et seq.) Among other things, it prohibits job discrimination on the basis of race. (Gov. Code, § 12921.)

"FEHA has its federal counterpart in title VII of the Federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Since the antidiscrimination objectives and public policy purposes of the two laws are the same, we may rely on federal decisions to interpret analogous parts of the state statute." (*Sandhu* v. *Lockheed Missiles & Space Co.* (1994) 26 Cal.App.4th 846, 851 [31 Cal.Rptr.2d 617], citing *Clark* v. *Claremont University Center* (1992) 6 Cal.App.4th 639, 662 [8 Cal.Rptr.2d 151]; *Mixon* v. *Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316 [237 Cal.Rptr. 884].)

Under both federal and state law, it is unlawful for an employer to "discriminate against the person in compensation or in terms, conditions or

privileges of employment." (Gov. Code, § 12940, subd. (a); 42 U.S.C. § 2000e-2.)

■ In general, there are two types of illegal discrimination. These are disparate treatment and disparate impact. Under the disparate treatment theory, with which we are concerned here, an individual is discriminated against when the employer "treats some people less favorably than others because of their race, color, religion, sex or national origin." (*Teamsters* v. *United States* (1977) 431 U.S. 324, 335-336, fn. 15 [52 L.Ed.2d 396, 415, 97 S.Ct. 1843].)

In disparate treatment cases, the plaintiff must prove the ultimate fact that the defendant engaged in intentional discrimination. (*St. Mary's Honor Center* v. *Hicks* (1993) 509 U.S. 502, 510-511 [125 L.Ed.2d 407, 418, 113 S.Ct. 2742, 2749]; *Texas Dept. of Community Affairs* v. *Burdine* (1981) 450 U.S. 248, 253 [67 L.Ed.2d 207, 215, 101 S.Ct. 1089].) An employer will be liable for intentional discrimination if it is shown that its employment decision was premised upon an illegitimate criterion. (*McDonnell Douglas Corp.* v. *Green* (1973) 411 U.S. 792, 805, fn. 18 [36 L.Ed.2d 668, 679, 93 S.Ct. 1817].)

Proving intentional discrimination can be difficult because "[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes." (*U. S. Postal Service Bd. of Govs.* v. *Aikens* (1983) 460 U.S. 711, 716 [75 L.Ed.2d 403, 410-411, 103 S.Ct. 1478]; see also *Dugan* v. *Pennsylvania Millers Mut. Ins. Co.* (M.D.Pa. 1994) 871 F.Supp. 785.) It is rare for a plaintiff to be able to produce direct evidence or "smoking gun" evidence of discrimination. (*Dugan, supra,* 871 F.Supp. 785; see also *Chipollini* v. *Spencer Gifts, Inc.* (3d Cir. 1987) 814 F.2d 893, 897.)

■ In some cases, the evidence will establish that the employer had "mixed motives" for its employment decision. (See *Price Waterhouse* v. *Hopkins* (1989) 490 U.S. 228, 277-278 [104 L.Ed.2d 268, 305-306, 109 S.Ct. 1775] (conc. opn. of O'Connor, J.).) In a mixed motive case, both legitimate and illegitimate factors contribute to the employment decision. The plaintiff in a mixed motives case must demonstrate "direct evidence that decision-makers placed substantial negative reliance on an illegitimate criterion." (*Price Waterhouse* v. *Hopkins, supra,* 490 U.S. at p. 277 [104 L.Ed.2d at p. 305].) In other words, the plaintiff must produce "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." (*Fuller* v. *Phipps* (4th Cir. 1995) 67 F.3d 1137, 1142, see also *Ostrowski* v. *Atlantic Mut. Ins. Companies* (2d Cir. 1992) 968 F.2d 171, 182; *Starceski* v. *Westinghouse Elec.*

*Corp.* (3d Cir. 1995) 54 F.3d 1089, 1096; *Radabaugh* v. *Zip Feed Mills, Inc.* (8th Cir. 1993) 997 F.2d 444, 449.)[3]

■ In most cases of disparate treatment, the plaintiff will not have direct evidence of the employer's discriminatory intent. Consequently, the United States Supreme Court has developed rules regarding the allocation of burdens and the order in which proof is presented to resolve "the elusive factual question of intentional discrimination." (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 216]; see also *McDonnell Douglas Corp.* v. *Green, supra,* 411 U.S. 792.) Thus, plaintiffs may demonstrate via indirect or circumstantial evidence that they were the victims of discrimination.

The framework for these "pretext" cases includes three steps.[4] First, it is the plaintiff's burden to prove by a preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff proves the prima facie case, then the burden shifts to the defendant to provide some legitimate nondiscriminatory reason for its employment decision. Third, if the defendant carries this burden, then the plaintiff must have an opportunity to show by a preponderance of the evidence that the legitimate reasons offered by the

[3]For example, *Price Waterhouse* v. *Hopkins, supra,* was a mixed motive case involving discrimination based upon sex. In *Price Waterhouse,* there was evidence that persons in the decisionmaking process described the plaintiff as " 'macho,' " as " 'overcompensat[ing] for being a woman' " and urging her to " 'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.' " (*Price Waterhouse* v. *Hopkins, supra,* 490 U.S. at p. 235 [104 L.Ed.2d at p. 278].) Accordingly, in a mixed motive case, the plaintiff produces this type of direct evidence to demonstrate that a forbidden characteristic "played a motivating part" in the employment decision. (*Id.* at p. 250 [104 L.Ed.2d at p. 287].) By contrast, in *Fuller* v. *Phipps, supra,* 67 F.3d 1137, the court decided the evidence established a pretext case rather than one involving mixed motives. In *Fuller,* an African-American male sued a sheriff's office for race discrimination after he was rejected for a position as correctional officer. He sought a mixed motive instruction based upon statistical evidence suggesting that the sheriff's office hired fewer African-American employees. He also produced evidence suggesting he was more qualified than the individuals selected and produced evidence that he was treated differently in the interviewing process. The court concluded, however, that even if believed, the plaintiff's allegations did not constitute the sort of direct evidence of discriminatory intent which would justify a mixed motive instruction. (*Ibid.*)

[4]In *Price Waterhouse,* the court noted: "Nothing in this opinion should be taken to suggest that a case must be correctly labeled as either a 'pretext' case or a 'mixed-motives' case from the beginning . . . indeed, we expect that plaintiffs often will allege, in the alternative, that their cases are both. Discovery often will be necessary before the plaintiff can know whether both legitimate and illegitimate considerations played a part in the decision against her. At some point in the proceedings, of course, the District Court must decide whether a particular case involves mixed motives. If the plaintiff fails to satisfy the factfinder that it is more likely than not that a forbidden characteristic played a part in the employment decision, then she may prevail only if she proves, following *Burdine,* that the employer's stated reason for its decision is pretextual." (490 U.S. at p. 247, fn. 12 [104 L.Ed.2d at pp. 285-286].)

defendant were not its true reasons, but were a pretext for discrimination. (*Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. at pp. 252-253 [67 L.Ed.2d at pp. 214-215], citing *McDonnell Douglas Corp.* v. *Green, supra*, 411 U.S. 792, 802-804 [36 L.Ed.2d 668, 677-679].)

Although the *McDonnell Douglas* presumption shifts the burden of *production* to the defendant, the ultimate burden of persuading the trier of fact that the defendant engaged in intentional discrimination remains at all times with the plaintiff. (*Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. at p. 253 [67 L.Ed.2d at p. 215]; see also *St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. 502, 506-507 [125 L.Ed.2d 407, 416, 113 S.Ct. 2742, 2747].) Further, if the defendant succeeds in carrying its burden of production, the *McDonnell Douglas* framework "drops from the case" and the trier of fact determines the ultimate question of whether the plaintiff has shown intentional discrimination. (*St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. at pp. 510-511 [125 L.Ed.2d at p. 418, 113 S.Ct. at p. 2749], citing (*Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. at p. 253 [67 L.Ed.2d at p. 215].)

In *McDonnell Douglas, supra*, the United States Supreme Court set forth a model for a prima facie case of racial discrimination. According to the court, the plaintiff could establish the prima facie case by demonstrating "(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*McDonnell Douglas Corp.* v. *Green, supra*, 411 U.S. at p. 802 [36 L.Ed.2d at p. 677]; see also *Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. at p. 253, fn. 6 [67 L.Ed.2d at p. 215].)

In *McDonnell Douglas*, the court explained that its standard was not inflexible because the elements of the prima facie case would vary according to the differing title VII factual situations. (411 U.S. at p. 802, fn. 13 [36 L.Ed.2d at pp. 677-678].) The *McDonnell Douglas* model was "never intended to be rigid, mechanized, or ritualistic." (*Furnco Construction Corp.* v. *Waters* (1978) 438 U.S. 567, 577 [57 L.Ed.2d 957, 967-968, 98 S.Ct. 2943].) The importance of *McDonnell Douglas* is *not* in its specification of the discrete elements of proof but is instead in its recognition that the title VII plaintiff carries the initial burden of offering evidence *which creates an inference that an employment decision was based on an illegal discriminatory criterion.* (*Teamsters* v. *United States, supra*, 431 U.S. 324, 358 [52 L.Ed.2d

396, 429]; see also *O'Conner* v. *Consolidated Coin Caterers Corp.* (1996) __ U.S. __ [134 L.Ed.2d 433, 116 S.Ct. 1307].)[5]

The burden of proving a prima facie case of disparate treatment is not onerous. (*Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. at p. 253 [67 L.Ed.2d at p. 215]; see also *Sischo-Nownejad* v. *Merced Community College Dist.* (9th Cir. 1991) 934 F.2d 1104, 1111 [amount of evidence that must be produced in order to create a prima facie case is "very little"]; *Caldwell* v. *Paramount Unified School Dist.* (1995) 41 Cal.App.4th 189 [48 Cal.Rptr.2d 448] [same].)

*U. S. Postal Service Bd. of Govs.* v. *Aikens, supra,* 460 U.S. 711, emphasized that the crucial issue in pretext cases was the issue of intentional discrimination rather than the issue of what the plaintiff was required to prove as part of his or her prima facie case. In *Aikens,* an African-American postal worker sued the United States Postal Office claiming that the postal service "discriminatorily" failed to promote him. (*Id.* at p. 712 [75 L.Ed.2d at p. 408].) The postal service argued that an employee who shows only that he is African-American, that he applied for a promotion for which he possessed the minimum qualifications, and that the employer selected a nonminority applicant has not established a "prima facie" case of employment discrimination. According to *Aikens,* "Because this case was fully tried on the merits, it is surprising to find the parties and the Court of Appeals still addressing the question whether [plaintiff] made out a prima facie case. We think that by framing the issue in these terms, they have unnecessarily

---

[5]*McDonnell Douglas Corp.* v. *Green, supra,* demonstrates an application of this prima facie model. In that case, Green, a mechanic, worked for the employer for approximately eight years before being laid off during the course of a general reduction in the employer's work force. Green, a longtime activist in the civil rights movement, vigorously protested his discharge because he believed it, as well as the employer's general hiring practices, were racially motivated. As part of his protest, Green, along with others, participated in a "stall-in" and was aware of a "lock-in" in which access to the employer's plant was blocked. Subsequently, the employer advertised for qualified mechanics and Green promptly applied for reemployment. Green's application was denied by the employer because of Green's involvement in the protests. Shortly thereafter, Green filed a complaint with the Equal Employment Opportunity Commission, claiming that he was not rehired because of his race and involvement in civil rights activities. After the commission unsuccessfully attempted to resolve the dispute, Green filed suit. The employer denied Green's claims, contending that its employment decision was based upon Green's unlawful participation in the protest activities. The United States Supreme Court decided that Green had established a prima facie case, as set forth in its model described above. As the court stated, "[The employer] sought mechanics, [Green's] trade, and continued to do so after [Green's] rejection. [The employer], moreover, does not dispute [Green's] qualifications and acknowledges that his past work performance in [employer's] employ was 'satisfactory.' " (*McDonnell Douglas Corp.* v. *Green, supra,* 411 U.S. at p. 802 [36 L.Ed.2d at p. 678], fns. omitted.) Hence, as the facts of *McDonnell Douglas* demonstrate, nothing within *McDonnell Douglas* itself supports Lockheed's claim as to the elements of a plaintiff's prima facie case.

evaded the ultimate question of discrimination *vel non*." (*Id.* at pp. 713-714 [75 L.Ed.2d at pp. 408-409].) The court reasoned that "The prima facie case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanical, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" (*U. S. Postal Service Bd. of Govs.* v. *Aikens, supra*, 460 U.S. at p. 715 [75 L.Ed.2d at p. 410], quoting *Furnco Construction Corp.* v. *Waters, supra*, 438 U.S. 567, 577 [57 L.Ed.2d 957, 967-968].)

*Aikens* stressed that "All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult. The prohibitions against discrimination contained in the Civil Rights Act of 1964 reflect an important national policy. There will seldom be 'eyewitness' testimony as to the employer's mental processes. But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. *Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern 'the basic allocation of burdens and order of presentation of proof,' [citation] in deciding this ultimate question.*" (*U. S. Postal Service Bd. of Govs.* v. *Aikens, supra*, 460 U.S. at p. 716 [75 L.Ed.2d at p. 411], italics added; see also *Dugan* v. *Pennsylvania Millers Mut. Ins. Co., supra*, 871 F.Supp. 785; *Cumpiano* v. *Banco Santander Puerto Rico* (1st Cir. 1990) 902 F.2d 148.)

A recent United States Supreme Court decision, *St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. 502 [125 L.Ed.2d 407, 113 S.Ct. 2742], assists our analysis. *St. Mary's* held that a finding that an employer's explanation for discharging an employee was pretextual cannot act as a substitute for the trier of fact's finding of unlawful discrimination. Thus, just because an employee establishes the falsity of an employer's reasons for discharging him or her does not *compel* a judgment in the plaintiff's favor. (*St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. at p. 508 [125 L.Ed.2d at p. 417, 113 S.Ct. at p. 2748].) Although rejection of the employer's reasons permits the factfinder to infer the ultimate issue of intentional discrimination, such rejection does not entitle the plaintiff to judgment as a matter of law. (*Ibid.*)

In reaching this conclusion, Justice Scalia responded to criticism from the dissenting justices.[6] According to the dissent, *St. Mary's* constituted a change in the law. In reply, the majority disagreed. To prove that *St. Mary's* did not change existing law, and to demonstrate that the dissent's interpretation of

---

[6]The dissent in *St. Mary's* suggests that Lockheed's description of the plaintiff's prima facie burden is incorrect: "This Court has not directly addressed the question whether the personal characteristics of someone chosen to replace a Title VII plaintiff are material, and

the law pre-*St. Mary's* was incorrect, the majority offered the following hypothetical:

"Assume that 40% of a business' work force are members of a particular minority group, a group which comprises only 10% of the relevant labor market. An applicant, who is a member of that group, applies for an opening for which he is minimally qualified, but is rejected by a hiring officer of that *same minority group*, and the search to fill the opening continues. The rejected applicant files suit for racial discrimination under Title VII, and before the suit comes to trial, the supervisor who conducted the company's hiring is fired. Under *McDonnell Douglas, the plaintiff has a prima facie case*, . . . and under the dissent's interpretation of our law not only must the company come forward with some explanation for the refusal to hire (which it will have to try to confirm out of the mouth of its now antagonistic former employee), but the jury must be instructed that, if they find that explanation to be *incorrect*, they must assess damages against the company, *whether or not they believe the company was guilty of racial discrimination.* The disproportionate minority makeup of the company's work force and the fact that its hiring officer was of the same minority group as the plaintiff will be irrelevant, because the plaintiff's case can be proved 'indirectly by showing that the employer's proffered explanation is unworthy of credence.' [Fn. omitted.] Surely nothing short of inescapable prior *holdings* (the dissent does not pretend there are any) should make one assume that this is the law we have created." (*St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. at pp. 513-514 [125 L.Ed.2d at pp. 420-421, 113 S.Ct. at pp. 2750-2751], second italics added.)

Thus, according to the *St. Mary's* hypothetical, a plaintiff can establish a prima facie case *without* having to demonstrate that the position was filled by an individual outside the protected class, and *without* having to produce any facts relating to similarly situated employees outside the protected class.[7] Although the hypothetical shows that the racial makeup of the employer's work force as well as the race of the hiring officer should be considered, it is also clear from the hypothetical that this evidence would not prevent the plaintiff from establishing a prima facie case.

---

that issue is not before us today." (*St. Mary's Honor Center* v. *Hicks, supra*, 509 U.S. at p. 527, fn. 1 [125 L.Ed.2d at p. 429, 113 S.Ct. at p. 2758], (dis. opn. of Souter, J.).)

[7]The fact that Lockheed's description of the plaintiff's prima facie case is erroneous is also demonstrated by *St. Mary's* statement that "nothing in law would permit us to substitute for the required finding that the employer's action was the product of unlawful discrimination, the much different (and much lesser) finding that the employer's explanation of its action was not believable. The dissent's position amounts to precisely this, *unless* what is required to establish the *McDonnell Douglas* prima facie case is a degree of proof so high that it would, in absence of rebuttal, require a directed verdict for the plaintiff (for in that case proving the employer's rebuttal noncredible would leave the plaintiff's directed-verdict case in place, and

 Having considered this authority, we next consider the circumstances presented here. Lockheed insists Heard was required to prove, as part of his prima facie case, that similarly situated non-African-American employees received the employment terms and conditions which he sought. We conclude that Lockheed's contention is incorrect.

First, as demonstrated above, such a requirement was never included in the prima facie model described in *McDonnell Douglas Corp.* v. *Green, supra,* 411 U.S. 792, or *Texas Dept. of Community Affairs* v. *Burdine, supra,* 450 U.S. 248. That model did not include the similarly situated requirement. Nor did it require proof regarding the employer's treatment of employees outside the protected class. Further, such a requirement cannot be found in *St. Mary's Honor Center,* or the other United States Supreme Court opinions we have discussed. Thus, the United States Supreme Court decisions do not support Lockheed's contention.

Second, we note that whatever the merit of the similarly situated model, it is obvious that it was misapplied here. Lockheed argued the similarly situated requirement meant Heard had to prove that non-African-American *convicted felons* received the employment terms and conditions which Heard sought. Lockheed's interpretation of the similarly situated attribute effectively eliminated Lockheed's obligation to produce a legitimate nondiscriminatory reason for its employment decision. By defining "similarly situated" to mean employees with felony convictions, Lockheed simply lifted an ostensibly legitimate reason for failing to promote Heard and engrafted it as part of the elements of Heard's prima facie case. Under Lockheed's theory, any plausible reason for discharging an employee would become a relevant characteristic for the purpose of identifying employees similarly situated to the plaintiff.

For example, assume the plaintiff had poor communication skills. Instead of the employer having the burden of stating a legitimate nondiscriminatory reason for its employment decision—that the plaintiff was not promoted because of his or her poor communication skills—the plaintiff would be required, as part of his or her prima facie case, to show that promotions were given to employees outside the protected class who also possessed poor communication skills. Although such proof is surely *relevant* with respect to the employer's motive in failing to promote, it is not proof which should be part of the plaintiff's prima facie case.

compel a judgment in his favor). *Quite obviously, however, what is required to establish the McDonnell Douglas prima facie case is infinitely less than what a directed verdict demands."* (*St. Mary's Honor Center* v. *Hicks, supra,* 509 U.S. at pp. 514-515 [125 L.Ed.2d at p. 421, 113 S.Ct. at p. 2751], some italics added.)

Third, we must stress that this case does not involve a failure to promote in the traditional sense. Heard does not allege that Lockheed failed to promote him to a specific position. Rather, he claims he did not receive certain employment terms and conditions, such as a merit increase, an accurate performance appraisal, and the ability to engage in unrestricted travel. Given these allegations, it is somewhat incongruous to require Heard to produce proof regarding "similarly situated" employees outside the protected class. No employee replaced Heard; no employee obtained a position which Heard sought. In these circumstances, even if we were to find that Lockheed's model was valid (which we do not), Heard's discrimination claim simply would not fit neatly within its framework.

In essence, we believe Lockheed's position misconstrues the fundamental nature of the *McDonnell Douglas* burden-shifting framework. The framework was established to resolve the "elusive factual question of intentional discrimination." (*Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. 248, 255, fn. 8 [67 L.Ed.2d 207, 216].) Although proof regarding similarly situated employees outside the protected class may be one way of raising an inference of intentional discrimination, *it is not the only way*. As noted above, the *McDonnell Douglas* framework was never intended to be mechanical or ritualistic. (*Furnco Construction Corp.* v. *Waters, supra*, 438 U.S. 567, 577 [57 L.Ed.2d 957, 967-968].) The purpose of the prima facie case is for the plaintiff to produce evidence demonstrating that the employment decision occurred in "circumstances which allow the court to infer unlawful discrimination." (*Craik* v. *Minnesota State University Bd.* (8th Cir. 1984) 731 F.2d 465, 469; *Walker* v. *St. Anthony's Medical Center* (8th Cir. 1989) 881 F.2d 554, 558; *Davenport* v. *Riverview Gardens School Dist.* (8th Cir. 1994) 30 F.3d 940.) The plaintiff must produce evidence which permits an inference of illegal intentional discrimination. (*Teamsters* v. *United States, supra*, 431 U.S. 324, 358 [52 L.Ed.2d 396, 429]; *O'Conner* v. *Consolidated Coin Caterers Corp., supra*, __ U.S. __ [134 L.Ed.2d 433, 116 S.Ct. 1307]; see also *Ewing* v. *Gill Industries* (1992) 3 Cal.App.4th 601, 610 [4 Cal.Rptr.2d 640].) The plaintiff's burden in this respect is not onerous. (*Texas Dept. of Community Affairs* v. *Burdine, supra*, 450 U.S. at p. 253 [67 L.Ed.2d at p. 215].)

To state that a plaintiff may never establish a prima facie case if the plaintiff fails to produce evidence that similarly situated employees outside the protected class were promoted, restricts unfairly the circumstances from which discrimination may be inferred. (Cf. *Ewing* v. *Gill Industries, Inc., supra*, 3 Cal.App.4th 601, 610 [courts have not adopted single statement of elements of prima facie case].) Such a requirement also unfairly emphasizes one way of proving intentional discrimination instead of properly focusing

upon the pivotal issue in disparate treatment cases—whether a *particular individual* was discriminated against and why. (Cf. *Cumpanio* v. *Banco Santander Puerto Rico, supra,* 902 F.2d 148, 156.) Although the characteristics of the employee replacing a discharged or demoted employee are certainly relevant in evaluating an employer's motive for an employment decision, we believe those characteristics go to the weight of the evidence rather than its legal sufficiency. (Cf. *Walker* v. *St. Anthony's Medical Center, supra,* 881 F.2d 554, 558; *Giannotti* v. *Foundry Cafe* (D.Conn. 1984) 582 F.Supp. 503, 506.)[8]

Indeed, in *Ewing* v. *Gill Industries, supra,* 3 Cal.App.4th 601, we reached a similar conclusion in the context of an age discrimination claim. In *Ewing,* defendant argued that plaintiff was required to prove that a full-time job still existed at the time of plaintiff's discharge. We disagreed. We emphasized that the prima facie requirements would vary with the circumstances of the case, and found that the circumstances presented indicated age was a determining factor in the defendant's decision to terminate plaintiff. (*Id.* at pp. 612-613.)

■ Having concluded that Heard was *not* required to prove, as part of his prima facie case, that similarly situated non-African-American employees received the employment terms and conditions which he sought, we must next consider the impact of the error. In this case, the error infected both the jury instructions and the special verdict questions. Although Heard objected, the jurors were instructed that the similarly situated requirement was part of Heard's prima facie case. In addition, the special verdict questions isolated the similarly situated requirement, making it the subject of a separate special

---

[8] We believe the trial court's confusion stemmed in part from a misunderstanding of *Mixon* v. *Fair Employment & Housing Com., supra,* 192 Cal.App.3d 1306. In *Mixon,* this court recognized that in a wrongful discharge case, the plaintiff has the initial burden of showing he was discharged " 'under circumstances which give rise to an inference of unlawful discrimination.' " (*Id.* at p. 1318.) *Mixon* stated that these "circumstances *generally* fall into two categories: either he was replaced by a nonminority member no more qualified than he [citations], or he was fired when nonminority co-workers similarly situated were not fired. [Citations.]" (*Ibid.,* italics added.) From this, *Mixon* concluded that the "prima facie case for discriminatory discharge can therefore be stated thusly: (1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class." (*Ibid.*) Thus, even *Mixon* recognized that it was stating two *general,* but *not exclusive,* types of circumstances raising an inference of discrimination. Further, *Mixon* set forth the elements with regard to a wrongful discharge claim. Heard's claim was for denial of employment terms and conditions; *not* for wrongful discharge. Lockheed also cites *German* v. *Killeen* (E.D.Mich. 1980) 495 F.Supp. 822 to support its "similarly situated" instruction. However, we are not bound by *German.* To the extent that *German* supports Lockheed's claim, we disagree with it and decline to follow it.

verdict question. In this respect, the jury instructions and special verdict questions were also inconsistent.[9] Although the jurors were *instructed* that the similarly situated requirement was a part of Heard's prima facie case, the special verdict questions isolated the similarly situated issue, setting it apart from the special verdict question regarding plaintiff's prima facie case, and thereby suggested it was *not* part of that prima facie case.[10]

■ *Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298] sets forth the standard for assessing the prejudicial impact of erroneous jury instructions: "A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' [Citation.] . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' . . . [¶] . . . Thus, when deciding whether an error . . . was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Id.* at pp. 580-581.)

■ Applying these factors here, it is apparent that there was a miscarriage of justice. First, there was evidence to support an inference of racial discrimination. There was evidence that Heard performed his job satisfactorily before Parisi became manager. There was evidence that after Parisi became manager, Heard was "restacked," received a lower performance rating, had his travel privileges restricted, and was denied a merit increase. There was evidence that Lockheed's own investigation concluded that Heard

---

[9]Lockheed argues that this inconsistency was waived because Heard stipulated to the special verdict form. We disagree. Heard's counsel claims he stipulated to the *preliminary* version of the special verdict form. His 1994 declaration supports his contention. In that declaration, counsel explains that the special verdict form was drafted by defense counsel and that neither "plaintiff or his counsel" had anything to do with the language selected. Heard's counsel admits not objecting to the special verdict form as originally proposed. However, he contends the special verdict form was subsequently changed "three, and possibly four, times as to its substance, organization and composition."

[10]Ironically, the jurors' responses to the special verdict questions in the face of this inconsistency suggest the jurors themselves recognized that an inference of unlawful discrimination could exist without evidence regarding similarly situated employees. In response to the first special verdict question on the issue of race discrimination—"Did plaintiff prove by a preponderance of the evidence that a *prima facie* case of discrimination existed concerning the terms and conditions of his employment as they existed prior to December 31, 1991?"—the jurors responded "yes." In response to the second special verdict question—"Did plaintiff establish by a preponderance of the evidence that similarly situated non-African-American employees, as defined under the California Fair Employment and Housing Act, were treated differentially in the terms and conditions of their employment prior to December 31, 1991?"—the jurors responded "no."

was entitled to a merit increase, entitled to have the travel restrictions removed, and entitled to a higher performance appraisal. There was evidence that Heard believed Parisi's employment actions were based upon Heard's race. There was evidence that Parisi stated that all minorities were low performers. There was evidence that other African-Americans believed Parisi had engaged in racist conduct. There was evidence that other employees had complained about Parisi being racist. This was sufficient evidence from which a jury could find an *inference* of discrimination based upon race.

In addition, other jury instructions compounded the problem. Instruction 29 defined "similarly situated" as an employee who "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Not only did this instruction re-emphasize the similarly situated requirement, its wording supported Lockheed's contention that similarly situated meant an employee who had been convicted of a felony.

Arguments by Lockheed's counsel also added to the prejudicial effect. During closing argument, counsel stressed that Heard had not produced any evidence that Lockheed had treated non-African-American convicted felons better than Lockheed treated Heard. For this reason, counsel argued, the jury had no choice but to reject Heard's discrimination claim.

The special verdict highlighted the similarly situated language, providing that if the jury did not find evidence of similarly situated non-African-American employees, its consideration of Heard's race discrimination claim was ended. The special verdict form prevented the jury from deciding the ultimate issue in the case: Did Lockheed intentionally discriminate against Heard? The jury never had a chance to answer the special verdict question regarding the legitimacy of Lockheed's nondiscriminatory reason for its employment action. The jury never had a chance to consider whether that reason was pretextual.[11]

Finally, we also note that the confused state of the jury instructions and special verdict could have been avoided if the parties had realized that the

---

[11]Although no party raises the issue, and although we do not decide the case on this point, we are compelled to mention the other glaring error in the jury instruction on Heard's prima facie case. The instruction was flawed in more than one respect. Besides improperly including the similarly situated language, the instruction required that the jury find that race was a determining factor in Lockheed's employment decision, that the employment decision caused Heard damage and even required the jury to assess the nature, extent, and amount of damage suffered. This was all included as part of Heard's *prima facie case*. In other words, the jury was instructed to make these findings *before* the jury was allowed to consider whether Lockheed had articulated a reasonable nondiscriminatory basis for its employment action. That no one has raised this issue is startling, to say the least. That there was no objection to this part of the instruction below is even more surprising. In any event, since no one raises it here or below, we do not base our decision on it. We note it here, however, because by

*McDonnell Douglas* framework is a burden-shifting tool—not a subject on which the jury should be instructed. This subject was recently addressed in *Caldwell* v. *Paramount Unified School Dist.*, *supra*, 41 Cal.App.4th 189. However, since neither party raises the issue on appeal, and since both parties agreed below that the jury should be instructed on the *McDonnell Douglas* framework, we will simply state that we agree with *Caldwell*'s ultimate conclusion: "[W]hether or not a plaintiff has met his or her prima facie burden, and whether or not the defendant has rebutted the plaintiff's prima facie showing, *are questions of law for the trial court, not questions of fact for the jury.*" (*Id.* at p. 201, italics added.) Upon retrial, the parties can avoid the problems presented here by recognizing that the jury should never have been instructed on the elements of Heard's prima facie case.[12]

### Disposition

The judgment of the trial court is reversed. Costs on appeal to appellant.

Premo, Acting P. J., and Mihara, J., concurred.

---

answering the first special verdict question "yes," the jurors ostensibly found that race was a determining factor in Lockheed's employment decision.

[12]Heard also argues in his appeal that the trial court made various improper evidentiary rulings. Because the issue might come up upon retrial, we have reviewed these claims, and conclude the trial court's rulings were within its discretion. Heard also claimed that judgment should have been entered in its favor because it was the prevailing party. *St. Mary's Honor Center, supra,* makes it clear that a plaintiff who establishes a prima facie case is not entitled to judgment as a matter of law and therefore Heard's claim must be rejected. Heard does not raise the argument that because the jury's instruction on Heard's prima facie case included a finding that race was the determining factor in Lockheed's employment decision—that judgment should have been entered in his favor.