Filed 1/15/14  Chiang v. County of Los Angeles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MING C. CHIANG, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF LOS ANGELES et al., <br><br> Defendants and Appellants. | B238948 <br><br> (Los Angeles County <br> Super. Ct. No. BC442067) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Kenneth R. Freeman, Judge.  Affirmed.

        Law Offices of Tony M. Lu and Tony M. Lu for Plaintiff and Appellant.

        Martin & Martin, Areva D. Martin, Eileen Spadoni and Jacqueline S. Treu for Defendants and Appellants.

_____

Plaintiff Ming Chiang, appeals summary judgment on his complaint for discrimination and retaliation under the Fair Employment and Housing Act (Gov. Code, § 12900 et seq.) (FEHA). Plaintiff is a pharmacist with defendant County of Los Angeles (County) who worked the night shift at one of the County's pharmacies, and contended that he made numerous requests to transfer to the day shift but was rebuffed because of his age, race, national origin, and gender. Defendants asserted that plaintiff's claims were (1) barred by the statute of limitations, (2) failed on the merits because the County had a legitimate, nondiscriminatory reason for keeping plaintiff on the night shift, and (3) defendant Sandra Hudson, plaintiff's supervisor, had statutory immunity. The County appeals the trial court's refusal to award it attorney fees under FEHA. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff's complaint alleged six causes of action: (1) discrimination based on sex, (2) discrimination based on national origin and ancestry, (3) discrimination based on age; (4) harassment based on sex, national origin, ancestry and age, (5) retaliation, and (6) failure to prevent discrimination, harassment and retaliation. Plaintiff named the County and his immediate supervisor Sandra Hudson as defendants.

### A.    Factual Background

The parties' evidence set forth the following:

Plaintiff is a 60-year-old Taiwanese male.

Kenneth Mar, the pharmacy chief of the County's H. Claude Hudson Pharmacy, supervised the pharmacy's employees from January 1988 to 2004. Mar hired plaintiff in June 1999 to work the night shift from 3:30 p.m. to midnight.[1] At the time, plaintiff told Mar he was happy to have the night shift for family reasons. After his hiring, plaintiff was placed on the day shift for four months to be trained in the County's pharmacy procedures. After completing this orientation, plaintiff worked the night shift from

---

[1] The pharmacy has three shifts: the day shift, from 9:00 a.m. to 5:30 p.m.; the afternoon shift, from 12:00 p.m. to 8:30 p.m.; and the night shift, from 3:30 p.m. to 12:00 a.m.

2

approximately 3:30 p.m. to midnight. Although plaintiff spent four to six weeks on the day shift for orientation, Mar specifically told plaintiff his permanent assignment was to the night shift.

Plaintiff disputes that he was told he would be permanently assigned to the night shift. Plaintiff asserted the night shift was physically taxing because after 5:00 p.m., the evening pharmacist was responsible for all of the telephone requests and prescription checking, but could share some of those duties with the day shift; the day shift had at least 12 pharmacists and 11 technicians. After May 2002, plaintiff was the only pharmacist working the night shift. As a result, plaintiff asserted he developed severe health problems, suffered from hypertension, and his doctor had told him to reduce stress at work.

### 1. Incidents with Donna Doan

In early 2000, Donna Doan worked a day shift that ended during the evening shift. In 2000, Doan told Ernest Dominguez, her supervisor, about several negative confrontations she had with plaintiff. Things went smoothly for Doan before plaintiff started working at the pharmacy but after plaintiff started, in October 1999 she had a confrontation with plaintiff. Doan was checking a technician's work and had to take a phone call. When she returned, all of the medication that she had not checked was gone. The technician told her plaintiff gave all of the medication to the patient. Doan asked plaintiff if he checked the medication, and plaintiff responded that he had not done so. Plaintiff told Doan that he saw her signature on one vial, and so did not look at the other vials. When Doan asked plaintiff not to give out the medication without checking it again because she was responsible, plaintiff got very angry. He said, "I told you I saw your signature and gave it out for you," and "what do you want? [W]hat do you want? I did you a favor." Doan admonished plaintiff that if he wanted to give out the medication to the patient, he had to check it first. Defendant responded in a very harsh voice, "This is America OK! [A]nd when I said that's it, I mean that's it." Plaintiff told Doan to "get out of here" and "go back to your country." Plaintiff approached Doan and continued to

3

yell and scream in her face. The technician came between them and broke up the confrontation. Doan reported the incident to her supervisor the next day.

After the incident, plaintiff often would swing his arm with a dirty look at Doan and make gestures while mumbling. In April 2000, there was leftover food from the day shift. Doan gathered up the food and asked a technician to help her. Plaintiff instructed the technician to ignore Doan, telling him, "You don't have to do that" and "[y]ou don't have to listen to her."

A week later, a patient came in during the night shift to ask about discrepancies in his prescription. Plaintiff got angry and told the technician to call security to escort the patient out because plaintiff did not want to waste time with the patient. After the technician hesitated, plaintiff called security himself and said, "Treat idiot as idiot, and idiot has to be treated as idiot."

On May 23, 2000, the supervisor assigned Doan to a five-week schedule on the night shift to take place during June; Doan was told plaintiff would be assigned to a five-week night schedule during July. After plaintiff spoke to the supervisor about this new schedule, Doan observed plaintiff come out of the supervisor's office "way out of control." Plaintiff started pounding on the counter and said in an angry voice, "Find another job. Find another job." Plaintiff swung his arm and walked back and forth by Doan. Plaintiff said to Doan, "You are too slow. Find another job," and "[y]ou can't handle this job. It's too hard for you. Go find a husband to feed you." Doan reported the incident to her supervisor.

In June 2000, Mar became aware that Doan and plaintiff did not get along, and Doan felt threatened and harassed by plaintiff. As a result of Doan's complaints, Mar moved Doan to the day shift so she would have no further contact with plaintiff. Mar denied telling plaintiff he would be considered for a day shift position, and Mar told plaintiff he would not be moved to the day shift. Mar's motivation in keeping plaintiff on the night shift was to prevent plaintiff from further verbal or physical harassment of Doan.

4

In November 2002 at a staff meeting, plaintiff demanded that the County institute a rotating shift for pharmacists at the H. Claude Hudson facility. George Hu, a senior male pharmacist of Taiwanese origin, spoke for other pharmacists and stated they were opposed to rotating shifts. Plaintiff lost his temper and started screaming at George Hu, "Do you want to risk you[r] life?" and "[y]ou don't know me!" Mar had to hold plaintiff back from physically attacking Hu. As a result of his threats against Hu, plaintiff received a 15-day suspension. Plaintiff asserts that after an investigation, the Civil Service Commission determined that he did not make threats of violence to George Hu, but that Hu was discourteous towards plaintiff. Further, plaintiff contends that many witnesses to the altercation did not hear plaintiff say, "[D]o you want to risk your life," and that Mar did not intervene.

In December 2002, Mar transferred to the day shift a pharmacist, Joseph Vu, who was junior to plaintiff. Mar did not consider plaintiff for this day shift position because Mar considered plaintiff the permanent night-shift pharmacist and also because plaintiff had problems interacting with Hu and Doan.

2.      *Sandra Hudson Becomes Plaintiff's Supervisor*

In June 2004, Mar left his position as chief of the H. Claude Hudson pharmacy, and Sandra Hudson was his replacement. Mar told Hudson to keep plaintiff separated from Hu and Doan. When Hudson took over, she took Mar's advice and kept plaintiff permanently on the night shift.

Plaintiff wrote comparatively fewer prescriptions than his day shift coworkers, and Hudson denied that plaintiff was denied overtime work.

During her tenure, Hudson hired two outpatient pharmacists to work the day shift. One, Dawn Nguyen, a female over the age of 40, was hired in 2005. The second position was initially offered to a white male, who declined the offer. Ultimately, Hudson hired Khanh Duong, a female under the age of 40, in October 2006. Generally, Hudson does not have any knowledge of the age or national origin of applicants, and hires employees based upon their credentials and perceived ability to do the job.

5

Plaintiff complained to Hudson that the female day shift pharmacists were cherry-picking the easier prescriptions to fill and were leaving early. In December 2008, plaintiff met with Hudson to address his concerns, but Hudson told him that if no one worked the night shift, the pharmacy would be closed, and told him he would not be transferred to the day shift because he was "male and . . . complain[ed] too much."

Hudson denied telling plaintiff she would not transfer him to the day shift because he was male, and never told plaintiff he complained too much. During plaintiff's employment at the pharmacy, he always received a "competent" rating. When plaintiff asked Hudson why he was not rated higher, she told him that it was the result of his issues with other employees and patient complaints. After Hudson hired Nguyen, plaintiff requested a transfer to the day shift, but Hudson denied his request. Similarly, when Duong was hired, plaintiff again requested a transfer to the day shift, but Hudson denied his request. In 2008 and 2009, Hudson placed two new pharmacists in the day shift (Thy Phan, a Vietnamese woman in her 30's, and Gladdys Brown, a woman in her 40's) without giving the opportunity to plaintiff. In 2008, when Phan left, plaintiff requested to take her position, but Hudson denied plaintiff's request.

On May 14, 2009, an attorney writing on plaintiff's behalf sent a letter to Hudson to demand that plaintiff be placed on the day shift with a 10 hour, four day a week schedule. Plaintiff did not receive a response to his attorney's letter. According to Hudson, only two pharmacists had that schedule, George Hu and Dawn Ngyuen; part of Ngugyen's schedule involved working with Doan. For that reason, Hudson would not have considered plaintiff for the day shift. Under the memorandum of understanding (MOU) with the County, pharmacists do not have the right to demand a change in shift. Plaintiff believes that the MOU gives him that right.

On March 18, 2010, plaintiff refused to fill a prescription because there was an ambiguity in the medication dosage and the quantity. In that situation, a pharmacist is required to contact the issuing physician to request a clarification, but plaintiff refused to do so. Hudson advised plaintiff his refusal would be considered insubordination.

6

Plaintiff asserted that it was a violation of his professional duties to file a prescription that was riddled with mistakes, and told Hudson he was uncomfortable doing so.

From October 2009 to January 2010, plaintiff asserted Hudson offered the younger female employees more overtime, permitting Nguyen to work through her lunch hour and come in early and work overtime. Hudson told plaintiff that Nguyen was "young" and she "work[ed] fast."

Plaintiff is not trained as a clinical pharmacist. Plaintiff understood from Mar he was permanently assigned to the night shift. Plaintiff admitted that the decision to put him on the night shift did not have anything to do with his sex, national origin, or race, and denied that George Hu bullied him based on his race, sex, or national origin. He claimed that he was the only Taiwanese in the pharmacy and Hudson put him on the night shift because she did not like him.

On September 5, 2009, plaintiff filed his first complaint with Department of Fair Employment and Housing (DFEH) alleging discrimination based on age, sex, national origin, and retaliation. DFEH sent plaintiff a right to sue letter on October 20, 2009.

At a May 2010 staff meeting, plaintiff expressed his concerns to Hudson that some pharmacists came in late and were paid overtime even though they were not technically working overtime because they had come in later. According to plaintiff, Hudson stated that there was a policy to pay employees in such situations, but that it was not enforceable.

In January 2011, on reporting to work, plaintiff found that his workstation had been stripped and reappointed for the arrival of the accreditation commission. He asserted that boxes of patient information were thrown away without his knowledge or permission. Plaintiff complained to Hudson, and she informed him that this workstation was a public area that all pharmacists were entitled to use. According to the County, in January 2011, all pharmacists were required to clean out their workstations for an accreditation; if they were not able to be present, their station would be cleaned by someone else.

7

In June 2011, plaintiff was released from work on disability leave. He attempted to find assignments in other County-operated pharmacies when he returned to work in August 2011, but could not do so.

2. *Procedural Background*

After filing a complaint with DFEH on July 12, 2010, on July 12, 2010, plaintiff received a right to sue letter from DFEH.

On July 22, 2010, plaintiff filed his complaint against the County and Hudson, alleging six causes of action based on violations of FEHA. Plaintiff sought compensatory and punitive damages and attorney fees.

On May 12, 2011, defendants filed a motion for summary judgment. Defendants argued that (1) plaintiff's claims and request for punitive damages lacked substantive merit because he could not establish the County's alleged acts were undertaken based on improper motives related to his age, national origin, or sex; (2) plaintiff's claims were barred by the one-year statute of limitations, and (3) plaintiff's claims against Hudson were barred by immunity. First, the County asserted plaintiff's claims failed on the merits because the undisputed evidence established that plaintiff was kept on the night shift for nondiscriminatory reasons, namely, his inability to get along with his coworkers and his claims of retaliation were not based on adverse employment actions. Second, plaintiff filed his complaint more than five years after the harassment by Hudson began in 2004. Third, Hudson enjoyed statutory immunity under Government Code section 820.2 because she was exercising her discretion when the alleged wrongful acts took place.

In opposition, plaintiff argued under the continuing violation doctrine, the statute of limitations did not run because some of the unlawful conduct occurred during the limitations period; and his claims had merit because the undisputed facts established he was denied his right to work the day shift by defendants' conduct in giving the day shift positions and more overtime to younger, female workers; Hudson was not entitled to

statutory immunity because under Government Code section 12940, subdivision (j)(3), she personally harassed plaintiff.

In reply, defendants asserted that plaintiff did not file a complaint with DFEH until September 2009, a full 10 years after the discrimination began; the evidence established defendants had legitimate, nondiscriminatory reasons for the employment actions taken; and Hudson had immunity as a matter of law because there was no evidence she harassed plaintiff.

Defendants filed 146 objections to plaintiff's evidence on the grounds of hearsay, lack of foundation, secondary evidence rule, improper opinion on ultimate issue, assumption of facts not in evidence, and speculativeness.

The trial court found "[m]uch, if not most" of plaintiff's evidence to be inadmissible because it consisted of the hearsay statements of third parties, speculation, and evidence that lacked foundation. The court found that the entire action was barred by the statute of limitations because plaintiff's DFEH complaint was filed in 2009, eight years after he was first assigned to the night shift in 2001 and four years after he was permanently assigned to the night shift in 2004, and the continuing violation doctrine did not apply because there was no evidence to support it. On the merits, the court found that there were no triable issues of fact on plaintiff's six causes of action because the undisputed facts established that Hudson hired based on credentials, and did not have knowledge of the national origin or race of applicants; the actions that plaintiff claimed were retaliatory did not constitute adverse action because those actions were Hudson's threat to write plaintiff up for refusing to write a prescription and telling plaintiff he complained to much. The court found because there was no wrongful conduct, there could be no claim for failure to prevent discrimination, and the court concluded that Hudson had immunity because she was acting on the instructions of her predecessor to keep plaintiff on the night shift because of conflicts with coworkers. Finally, there was no merit to plaintiff's claim for punitive damages because there was no evidence Hudson acted with malice, oppression, or fraud.

9

## DISCUSSION

### I.    Plaintiff's Appeal

Plaintiff contends there are triable issues that he was passed over for a transfer to the day shift based upon his age, gender, national origin and ancestry; plaintiff established triable issues of harassment based on Hudson's statement that he was not being given the day shift because he was male; and plaintiff established triable issues on his retaliation claim based on Hudson's threat to write him up for refusing to fill a prescription, cleaning out his workstation in his absence, and refusing to provide him the day shift; and he established triable issues of failure to prevent discrimination based on his complaints over the years concerning Hudson's conduct and the unequal employment opportunities. Plaintiff further argues the trial court erred in excluding his evidence, and in finding that Hudson had statutory immunity.

We conclude that plaintiff's claims fail on the merits because the County articulated a legitimate, nondiscriminatory reason for its actions, and plaintiff failed to rebut the County's showing by putting forth facts demonstrating the County's preferred reasons were false or pretextual. Even considering plaintiff's excluded evidence, we conclude that he has not rebutted the County's showing that it had a legitimate, nondiscriminatory reason for its actions. As a result, because we resolve the issue on the merits adversely to plaintiff, we need not consider whether plaintiff's claims are barred by the statute of limitations, whether the trial court improperly excluded plaintiff's declarations, and whether Hudson enjoys statutory immunity.[2]

#### A.    *Standard of Review*

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of

---

[2] Under the continuing violation doctrine, there can be "liability for unlawful employer conduct occurring outside the statute of limitations if it is sufficiently connected to unlawful conduct within the limitations period." (*Richards v. CH2M Hill, Inc*. (2001) 26 Cal.4th 798, 802.) If there has been no discriminatory conduct, there can be no "continuing violation" sufficient to extend the statute of limitations.

law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(1); *Aguilar*, at p. 849.) A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar*, at p. 850.) Where summary judgment has been granted, we review the trial court's decision de novo, "considering all of the evidence the parties offered in connection with the motion (except that which the trial court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill v. Navegar, Inc*. (2001) 26 Cal.4th 465, 476.)

**B.      Claims for Discrimination Based on Age, Sex and Race and National Origin (First, Second and Third Causes of Action) and Failure to Prevent Discrimination (Fourth Cause of Action)**

FEHA prohibits discrimination based on race, national origin, age, and gender, and proscribes discriminating in compensation or the terms, conditions or privileges of employment. (Gov. Code, § 12940, subd. (a).) Such adverse employment action must be substantial and detrimental and "'reasonably likely to impair a reasonable employee's job performance or prospects for advancement.'" (*Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 373.)

Where a case involves allegations of intentional discrimination, retaliation or a claim of wrongful termination in violation of public policy, this court utilizes a three-step analysis known as the *McDonnell Douglas* test.[3] (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 354.) Under that test, the plaintiff first must establish a prima facie case

_____

[3] *McDonnell Douglas v. Green* (1973) 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668]. The similarity between state and federal employment discrimination laws permits California courts to look to pertinent federal precedent when applying California statutes. (See, e.g., *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal.App.3d 1306, 1316.)

11

of discrimination. (*Id*. at p. 354.) Once the plaintiff meets the prima facie burden, a presumption of discrimination arises. (*Id.* at p. 355.) The burden then shifts to the defendant to produce admissible evidence that its action was taken for a legitimate, nondiscriminatory reason. (*Id*. at pp. 355–356.) Finally, once the employer has done so, the plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence which would permit a reasonable trier of fact to conclude the employer intentionally discriminated. (*Id*. at p. 356.) "This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Id.* at p. 354.)

However, the *McDonnell Douglas* test was originally developed for use at trial, not in summary judgment proceedings. (*Sada v. Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 150.) Although the burden of proof in a discrimination action claiming an unjustifiable termination ultimately rests with the plaintiff, in the case of a motion for summary judgment or summary issue adjudication, the burden rests with the moving party to negate the plaintiff's right to prevail on a particular issue. (*Arteaga v. Brink's, Inc*. (2008) 163 Cal.App.4th 327, 343–344.) In applying *McDonnell Douglas*'s shifting burdens of production in the context of a motion for summary judgment, the trial judge determines whether the parties have created an issue of fact to be decided by the jury. (*Sada*, at p. 150.) The plaintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of triable fact, nor do self-serving and uncorroborated declarations. (*King v. United Parcel Service, Inc*. (2007) 152 Cal.App.4th 426, 433.)

The specific elements of a prima facie case may vary depending on the particular facts. Generally, the plaintiff must provide evidence that "(1) he [or she] was a member of a protected class, (2) he [or she] was qualified for the position he sought or was

12

performing competently in the position he held, (3) he [or she] suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 355.)  With respect to claims for age discrimination, Government Code section 12941, subdivision (a) makes it unlawful to take adverse employment action against a person over the age of 40 on the grounds of age.  A prima facie case of age discrimination arises when the employee shows "(1) at the time of the adverse action he or she was 40 years of age or older, (2) an adverse employment action was taken against the employee, (3) at the time of the adverse action the employee was satisfactorily performing his or her job and (4) the employee was replaced in his position by a significantly younger person." (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1003.)  A claim for discrimination based on the plaintiff's gender requires a similar showing, with the prohibited action being taken based on the plaintiff's gender.  (*Vincent v. Brewer Co.* (6th Cir. 2007) 514 F.3d 489, 494.)

A case for racial discrimination requires a showing that the plaintiff (1) belongs to a racial minority; (2) "applied and was qualified for a job for which the employer was seeking applicants"; (3) "despite his [or her] qualifications, he [or she] was rejected"; and (iv) "after his [or her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1750.)  Discrimination is also prohibited based on national origin or ancestry, which is defined as the country where a person was born or from which his or her ancestors came.  (*Espinoza v. Farah Mfg. Co.* (1973) 414 U.S. 86, 88 [94 S.Ct. 334, 38 L.Ed.2d 287].)  The same elements must be established as with other discrimination claims.  (See, e.g., *Mixon v. Fair Employment & Housing Com.*, *supra*, 192 Cal.App.3d at p. 1318.)

If plaintiff establishes a prima facie case, the burden shifts to the employer to establish there was a legitimate, nondiscriminatory motive.  Legitimate reasons are those that are factually unrelated to prohibited bias.  (*Guz v. Bechtel National*, *supra*, 24

13

Cal.4th at p. 356.) If nondiscriminatory, the defendant's true reasons need not necessarily have been wise or correct. (*Id.* at p. 358.) "If the employer articulates such legitimate, nondiscriminatory reasons for the adverse employment action, the burden shifts to the employee to establish such reasons are merely a pretext for the adverse employment action." (*Id.* at p. 356.)

Here, plaintiff argues that four hires, 40 years of age or younger, were given the day shift instead of plaintiff and offered overtime on a regular basis; plaintiff was the only Taiwanese employee at the pharmacy and had a thick Taiwanese accent, and the day shift was offered to non-Taiwanese; and all of the new pharmacists hired from 2005 to 2009 were female, and Hudson told him he was not being moved to the day shift because he was male. However, the County presented copious evidence that the pharmacy's refusal to move plaintiff to the day shift was solely based on his inability to get along with most of his coworkers. The County submitted evidence that other candidates were given the day shift because they were qualified and did not have a record of disputes with coworkers. Other than his assertions of Hudson's and Hu's discriminatory motive, plaintiff put forth no other evidence establishing the County's non-discriminatory explanation for its decision to keep plaintiff on the night shift was false or a pretext. Plaintiff's subjective beliefs are not sufficient to create a triable issue of fact.

As we have found plaintiff has failed to create a triable issue of fact on his discrimination claims, he likewise cannot establish a claim for failure to prevent discrimination under Government Code section 19640, subdivision (k). (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 [where no discrimination has been shown, illogical to find claim for failure to prevent discrimination].)

### C. Harassment Claim (Fifth Cause of Action)

Supervisors are not individually liable for discrimination other than harassment. (*Reno v. Baird* (1998) 18 Cal.4th 640, 645–646.) Harassment can consist of non-sexual conduct that creates a hostile work environment, and such conduct may be based on gender, racial background, national origin, and age. (Gov. Code, § 12940, subd. (j).)

14

The victim must show the conduct was severe and pervasive and that the conduct was "unreasonably abusive or offensive" and "adversely affected the reasonable employee's ability to do his or her job." (*Davis v. Monsanto Chemical Co.* (6th Cir. 1988) 858 F.2d 345, 349.) Again, refusal to transfer plaintiff to the day shift cannot constitute harassment where, as we have found, the County had legitimate reasons for keeping plaintiff on the night shift.

### D. Retaliation Claim (Sixth Cause of Action)

FEHA prohibits actions taken in retaliation for protected activity. (Gov. Code, § 12940, subd. (h).) It is unlawful for an employer to retaliate against an employee because the employee has opposed a discriminatory practice prohibited under the FEHA (the "opposition" clause) or has filed a complaint, testified, or assisted in proceeding under the FEHA (the "participation" clause). (*George v. California Unemployment Ins. Appeals Bd.* (2009) 179 Cal.App.4th 1475, 1489.) "To establish a prima facie case of retaliation under FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. [Citations.] Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. [Citation.] If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation ""'drops out of the picture,'"" and the burden shifts back to the employee to prove intentional retaliation." (*Yankowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)

Here, plaintiff's retaliation claims were based on his refusal to fill a prescription, the cleaning of his desk in his absence, and the refusal to transfer him to the day shift. However, the County provided legitimate, nondiscriminatory reasons for these actions: if plaintiff had questions about the prescription, he was to contact the doctor, not refuse to fill it; plaintiff's desk was cleaned in his absence due to a pending inspection, and

15

everyone's desks were cleaned; and plaintiff was not given the day shift because of his inability to get along with his coworkers.

## II.     County's Appeal

The County appeals from the trial court's denial of its request for attorney fees, contending it is entitled to such fees because plaintiff's claims were overbroad, were untimely, and improperly named Hudson as an individual defendant.

### A.     *Factual Background*

After the trial court granted its summary judgment motion, the County moved pursuant to Government Code section 12965, subdivision (b) for attorney fees in the sum of $324,098.80. The County argued that plaintiff's complaint alleged conduct spanning a 10-year period, requiring it to review thousands of pages of documents and interview numerous witnesses; further, plaintiff's complaint was frivolous, groundless, and lacked any factual or legal merit. The County's factual material in support of its fees disclosed that its law firm, Martin & Martin, billed at the rate of $155 per hour; and incurred 2121.76 hours of time defending the County.

In opposition, plaintiff asserted that his action was not unreasonable, frivolous or meritless, the standard applied to award attorney fees to a defendant in a FEHA action, claiming such fees were awarded only where the plaintiff lied about discrimination or there was absolutely no evidence to support the plaintiff's claim. Further, plaintiff cited policy reasons for not awarding fees to such a defendant because the purpose of attorney fees in FEHA actions was to permit plaintiffs to bring FEHA actions to vindicate important policies; that purpose was not present where the defendant prevailed in the action.

At the hearing, the court stated that lack of merit to the plaintiff's case is not the proper standard to apply in determining whether to award attorney fees, and further that the court did not find plaintiff's case to be unreasonable, frivolous or meritless. The court noted that the types of cases in which fees were ordinarily awarded were those cases in which the plaintiff lied or had no evidence to support his or her claims. Here, the

16

court observed that plaintiff's inability to marshal evidence to support his continuing violation doctrine did not warrant a finding the action was meritless or frivolous. The court denied the County's request for fees.

### B.  Discussion

Government Code section 12965, subdivision (b) permits the trial court to award attorney fees and costs to the prevailing party in a suit for violations of FEHA. Section 12965 provides that awards of attorney fees are in the court's discretion; the trial court is in the best position to evaluate the legal services provided by attorneys, based on its own expertise, and expert testimony is not required. The court's determination of a proper award of fees will not be disturbed on appeal unless it clearly constitutes an abuse of discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096.) However, the correct application to a case of the statutory and case authority regarding awards of attorney fees is not a matter for the trial court's discretion but presents a question of law which we decide de novo. (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1132–1133.)

Fundamental to a determination of an attorney fee award, both in FEHA cases and other cases where awards of attorney fees are permitted, is a computation whereby the number of hours reasonably expended for legal services on behalf of the prevailing party is multiplied by a reasonable hourly rate. (*Flannery v. Prentice* (2001) 26 Cal.4th 572, 584.) The product of that computation is the "lodestar." (*PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1095.) The reasonable hourly rate is the rate prevailing in the community for similar work. (*PLCM Group*, at p. 1095.) In determining the lodestar, the trial court need not "'"become enmeshed in a meticulous analysis of every detailed facet of the professional representation."'" (*Id.* at p. 1098.) Moreover, "California case law permits fee awards in the absence of detailed time sheets. [Citations.]" (*Wershba v. Apple Computer, Inc*. (2001) 91 Cal.App.4th 224, 255.)

After the lodestar amount is arrived at, the trial court then determines whether that amount, considering the circumstances of the case, should be adjusted upwards or

downwards so as to "fix the fee at the fair market value for the legal services provided." (*PLCM Group, Inc. v. Drexler*, *supra*, 22 Cal.4th at p. 1095.)  In general, the court looks at "'the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.'"  (*Id.* at p. 1096.)

Whereas litigants are generally expected to pay their own attorney fees, section 12965 shifts that requirement.  "[T]he aim of fee-shifting statutes is 'to enable private parties to obtain legal help in seeking redress for injuries resulting from the actual or threatened violation of specific . . . laws.  Hence, if plaintiffs . . . find it possible to engage a lawyer based on the statutory assurance that he will be paid a "reasonable fee," the purpose behind the fee shifting statute has been satisfied.'  [Citation.]"  (*Flannery v. Prentice*, *supra*, 26 Cal.4th at p. 583.)  "There is no doubt that '"privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions'" [citation] and '"[w]ithout some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible."'  [Citation.]" (*Id.* at p. 583, fn. omitted.)  Regarding such fundamental public policies, "[t]he basic, underlying purpose of FEHA is to safeguard the right of Californians to seek, obtain, and hold employment without experiencing discrimination on account of race, religious creed, color, national origin, ancestry, physical disability, medical disability, medical condition, marital status, sex, age, or sexual orientation.  (Gov. Code, § 12920; [citation].)"  (*Id.* at pp. 582–583.)  Moreover, this fundamental policy that people be able to seek and hold employment free from prejudice recognizes that "'[j]ob discrimination "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general."'"  (*Id.* at p. 584.)  "It has long been recognized . . . that the contingent and deferred nature of the fee award in a civil rights or other case with statutory attorney fees requires that the fee be adjusted in

18

some manner to reflect the fact that the fair market value of legal services provided on that basis is greater than the equivalent noncontingent hourly rate. [Citation.]" (*Horsford v. Board of Trustees of California State University*, *supra*, 132 Cal.App.4th at pp. 394–395.)

In *Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383, the court held that "a prevailing plaintiff '"should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust."'" (*Id*. at p 1387, quoting *Christiansburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 416–417 [98 S.Ct. 694, 54 L.Ed.2d 648].) However, *Cummings* observed that the *Christiansburg* court had found that these equitable considerations were entirely absent in the case of a prevailing defendant. In that case, attorney fee awards should not be permitted routinely, but only where the action brought is "'"unreasonable, frivolous, meritless or vexatious."'" (*Cummings*, at p. 1387.) *Cummings* explained, "'[T]he term "meritless" is to be understood as meaning groundless or without foundation, rather than simply that the plaintiff has ultimately lost his case, and that the term "vexatious" in no way implies that the plaintiff's subjective bad faith is a necessary prerequisite to a fee award against him. In sum, a district court may in its discretion award attorney fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith.'" (*Ibid.*) Moreover, "'[i]n applying these criteria, it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or

19

unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit. . . .'" (*Id*. at p. 1388, quoting *Christiansburg Garment Co. v. EEOC*, *supra*, 434 U.S. at pp. 421–422.)

Here, we find no error. Although the trial court based its ruling on statute of limitations grounds and plaintiff's difficulty in marshalling evidence to rebut defendant's showing, the record discloses that plaintiff was routinely denied a transfer to the day shift, and observed that persons younger, of the opposite sex, and of a different race were awarded those positions. Further, although Hudson could not be liable for discrimination or retaliation, an individual defendant can be liable for harassment. Plaintiff had a thick accent, was older and male, and could have believed that the pharmacy's decision to keep him on the night shift was not the product of a few disputes with coworkers, but of a pattern of discrimination against him. Thus, although the record reflects defendants' actions were not undertaken with improper motives, the record contain no evidence plaintiff's action was meritless, unreasonable, or frivolous.

## DISPOSITION

The judgment is affirmed. The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED.

JOHNSON, J.

We concur:

ROTHSCHILD, Acting P. J.

CHANEY, J.

20